To:

Clerk's Office
4th Floor
United States Courthouse,
501 "I" Street, Sacramento, 95814



**FILED**

MAY 0 7 2012

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
        DEPUTY CLERK

In the matter of CASE No. S-12-0301 JAM CKD Smash Pictures, Plaintiff, vs. DOES 1-265,
Defendants. I am attaching an official copy of our "Motion To Quash Subpoena" for the court's
consideration.

A chambers copy has been mailed separately to the Courtroom Deputy Kyle Owen for the review of
Judge Delaney.

Thank you,

DOES 1-265,
Pro se

JoHN DoE
200 W. COMPTON BLVD.
COMPTON, CA. 90220

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF CALIFORNIA

Smash Pictures,

    Plaintiff,

vs.

DOES 1-265,

    Defendants.

_____/

CASE No. S-12-0301 JAM CKD

MOTION TO QUASH SUBPOENA

**FILED**

MAY **0 7** 2012

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
DEPUTY CLERK

## MOTION TO QUASH SUBPOENA

    Defendants received letters from internet service provider, Verizon Online,

regarding a subpoena, which the plaintiff has served on Verizon Online seeking disclosure of

private identity information (*attachment A*). From accounts of defendants in recent nearly

identical California law cases (*e.g. Hard Drive Productions, Inc. v DOES 1-90, Case5:11-cv-*

*03825-HRL*) subpoenaed information, if discovered, is followed by harassing letters by the

plaintiff's agents demanding thousands of dollars to settle the lawsuit, and harassing phone

calls, which are persistent. Since disclosure of DOES 1-265 personal information in order to

pursue such harassment is the plaintiff's objective, I respectfully request that I be allowed to

file this motion anonymously without revealing my personally identifying information.

### INTRODUCTION

    To cut court costs while suing as many individuals as possible, Plaintiff's counsel,

Scott M. Hervey is using improper joinders in their mass lawsuits alleging copyright

infringement through BitTorrent. In the Northern District of California, these nearly identical

BitTorrent cases have been severed for improper joinder:

> *Pacific Century International LTD v. Does 1-101 case 4:2011cv02533 (severed does 2-101)*
> *IO Group, Inc. v. Does 1-435 case 3:2010cv04382 (severed does 2-435)*
> *Diabolic Video Productions, Inc v. Does 1-2099 case 5:2010cv05865 (severed Does 2-2099)*
> *New Sensations, Inc v. Does 1-1768 case 5:2010cv05864 (severed Does 2-1768)*
> *Boy Racer, Inc v. Does 1-52 case 5:2011cv02329 (severed Does 2-52)*
> *Boy Racer, Inc v. Does 1-71 case 5:2011cv01958 (severed Does 2-72)*

In yet another nearly identical BitTorrent case, filed in the Northern District of

California, *Millennium TGA, Inc v. Does 1-21 case 3:2011cv02258*, Judge Samuel Conti found

the same joinder problems, and wrote in his order denying request for leave to take early

discovery, "This Court does not issue fishing licenses."

On March 30, 2012, United States Magistrate Judge Harold R. Lloyd of the San

Jose Division concluded:

"The court realizes that this decision may frustrate plaintiff and other copyright

holders who, quite understandably, wish to curtail online infringement of their works.

Unfortunately, it would appear that the technology that enables copyright infringement has

outpaced technology that prevents it. The court recognizes that plaintiff is aggrieved by the

apparent infringement and is sympathetic toward its argument that lawsuits like this one are the

only way for it to find and stop infringers. However, the court will not assist a plaintiff who

seems to have no desire to actually litigate but instead seems to be using the courts to pursue an

extrajudicial business plan against possible infringers (and innocent others caught up in the ISP

net). Plaintiff seeks to enlist the aid of the court to obtain information through the litigation

discovery process so that it can pursue a non-judicial remedy that focuses on extracting

"settlement" payments from persons who may or may not be infringers. This the court is not

willing to do." *Hard Drive Productions, Inc. v. Does 1-90 case 5:2011cv03825 (Attached*

*Document B)*

Second, I will argue Verizon Online's posted Privacy Policy *(Attached Document C)* fails to meet the legal requirements of California Business & Professions Code sections 22575-22579. *(Attached Document D)* and by non-compliance has failed to properly notify Does 1-265 of California-specific privacy rights.

Third, I will argue plaintiffs agents are in in violation of California Business and Professions Code Section 22948.2, the "Anti-Phishing Act of 2005." *(Attachments E, F)*

## ARGUMENT

### 1) Plaintiff Has Improperly Joined Individual Defendants Based on Entirely Disparate Alleged Acts

The Plaintiff's joinder of 265 defendants in this single action is improper and runs the tremendous risk of creating unfairness and denying individual justice to those sued. Mass joinder of individuals has been disapproved by federal courts in both the RIAA cases and elsewhere. Federal Rules For Civil Procedure's Rule 20 requires that, for parties to be joined in the same lawsuit, the claims against them must arise from a single transaction or a series of closely related transactions. Specifically:

"Persons . . . may be joined in one action as defendants if: (A) any right to relief is asserted against them jointly, severally or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences; and (B) any question of law or fact common to all defendants will arise in the action. "

Fed. R. Civ. P. 20. Thus, multiple defendants may be joined in a single lawsuit only when three conditions are met:

(1) the right to relief must be "asserted against them jointly, severally or in the alternative"; (2) the claim must "aris[e] out of the same transaction, occurrence, or series of transactions or occurrences"; **and** (3) there must be a common question of fact or law common to all the defendants. *Id.*

Joinder based on separate but similar behavior by individuals allegedly using the Internet to commit copyright infringement has been rejected by courts across the country. In *LaFace Records, LLC v. Does 1-38*, No. 5:07-CV-298-BR, 2008 WL 544992 (E.D.N.C. Feb. 27, 2008), the court ordered severance of lawsuit against thirty-eight defendants where each defendant used the same ISP as well as some of the same peer-to-peer ("P2P") networks to commit the exact same violation of the law in exactly the same way. The court explained: "[M]erely committing the same type of violation in the same way does not link defendants together for purposes of joinder." *LaFace Records*, 2008 WL 544992, at *2. In *BMG Music v. Does 1-4*, No. 3:06-cv-01579-MHP, 2006 U.S. Dist. LEXIS 53237, at *5-6 (N.D. Cal. July 31, 2006), the court *sua sponte* severed multiple defendants in action where the only connection between them was allegation they used same ISP to conduct copyright infringement. See also *Interscope Records v. Does 1-25*, No. 6:04-cv-197-Orl-22DAB, 2004 U.S. Dist. LEXIS 27782 (M.D. Fla. Apr. 1, 2004) (magistrate recommended *sua sponte* severance of multiple defendants in action where only connection between them was allegation they used same ISP and P2P network to conduct copyright infringement); *BMG Music v. Does 1-203*, No. Civ.A. 04-650, 2004 WL 953888, at *1 (E.D. Pa. Apr. 2, 2004) (severing lawsuit involving 203 defendants); General Order, *In re Cases Filed by Recording Companies*, filed in *Fonovisa, Inc. et al. v. Does 1-41* (No. A-04-CA-550 LY), *Atlantic Recording Corporation, et al. v. Does 1-151* (No. A-04-CA-636 SS), *Elektra Entertainment Group, Inc. et al. v. Does 1-11* (No. A-04-CA-703 LY); and *UMG Recordings, Inc., et al. v. Does 1-51* (No. A-04-CA-704 LY) (W.D.

Tex. Nov. 17, 2004), RJN Ex. A, (dismissing without prejudice all but first defendant in each of four lawsuits against a total of 254 defendants accused of unauthorized music file-sharing); Order Granting in Part and Denying in Part Plaintiffs' Miscellaneous Administrative Request for Leave to Take Discovery Prior to Rule 26 Conference, *Twentieth Century Fox Film Corp., et al., v. Does 1-12,* No. C-04-04862 (N.D. Cal Nov. 16, 2004) (in copyright infringement action against twelve defendants, permitting discovery as to first Doe defendant but staying case as to remaining Does until plaintiff could demonstrate proper joinder).

Plaintiff may argue that, unlike the RIAA cases, its allegations here are based upon use of the Internet to infringe a single work, "Bridesmaids XXX Porn Parody." While that describes the facts alleged in this case, it does not change the legal analysis. Whether the alleged infringement concerns a single copyrighted work or many, it was committed by unrelated defendants, at different times and locations, and perhaps subject to different defenses. That attenuated relationship is not sufficient for joinder. See *BMG Music v. Does 1-203, 2004 WL 953888.*

Discussions of the technical details of the BitTorrent protocol aside, the individual Defendants still have no knowledge of each other, nor do they control how the protocol works, and Plaintiff has made no allegation that any copy of the work they downloaded came jointly from any of the Doe defendants. Joining unrelated defendants in one lawsuit makes litigation less expensive for Plaintiff by enabling it to avoid the separate filing fees required for individual cases and by enabling its counsel to avoid travel, but that does not mean these well-established joinder principles need not be followed here.

2) **Verizon Online has failed to conspicuously post a privacy policy adequate to meet the requirements of California Business and Profess Code 22575 and consequently enables a violation of my consumer privacy rights under 22575.**

The relevant section reads:

22575.    (a) An operator of a commercial Web site or online service that collects personally identifiable information through the Internet about individual consumers residing in California who use or visit its commercial Web site or online service shall conspicuously post its privacy policy on its Web site, or in the case of an operator of an online service, make that policy available in accordance with paragraph (5) of subdivision (b) of Section 22577.

Verizon does post an online privacy policy *(Attachment C)* in fine print not "conspicuous." And the relevant section, enlarged here, reads:

"Information Collected on Verizon Websites: When you browse Verizon websites, information is collected about your device and your visit. We also collect data about your browsing, searching and buying activity as you interact with our sites. We may collect and use your IP address, mobile telephone or device number, account information, web addresses of the sites you come from and go to next and information about your connection, including your device's browser, operating system, platform type and Internet connection speed. We use this information for operational and performance measurement purposes including monitoring statistics such as how many people visit our websites; which pages people visit on our sites; how much time is spent on each page or; which browsers are used to visit our sites."

In the above statement, Verizon says they "may collect data" but they do not specify their record-keeping adequately for consumers to be aware of privacy exposures of the kind the plaintiff seeks. The plaintiff contends ISPs like Verizon keep identifying information about customers on their networks for only "90 to 180 days," hence the request for expedited discovery. If Verizon keeps logs of customer activity for 90 days they are obliged by 22575 to explain in technical detail what private information they are collecting, how long they are holding that information and under what terms and to whom they will release it. Holding this information any longer than absolutely necessary is a security breach that exposes customers private information to phishing, illegal marketing practices, and computer hackers. Plaintiff wants to force Verizon Online to give plaintiff private customer information for  purposes of

potential threat, harassment, and public exposure. If it is Verizon's policy to expose customer information, it should be clearly specified under what terms Verizon will comply with legal requests to breach privacy. As of now, 22575 is not fully met. Until 22575 is met and customers advised of the policy, Verizon should not release any private customer information of California residents. The subpoena to Verizon should be quashed because fulfilling the order and allowing the plaintiff access to customer information would violate the intention of 22575 which is to make California consumers fully informed on the kinds of information Verizon Online keeps and the terms under which it can be released.

3) **Plaintiff's agents are acting in violation of California Business and Professions Code Section 22948.2 also know as Anti-Phishing act of 2005.**

The relevant code is 22948.2 and states: "It shall be unlawful for any person, by means of a Web page, electronic mail message, or otherwise through use of the Internet, to solicit, request, or take any action to induce another person to provide identifying information by representing itself to be a business without the authority or approval of the business."

While the act was written into law in 2005 to protect citizens who might unwittingly provide private information to websites that fraudulently wish to harvest the citizen's private data, a broad reading of the act applies here and given the rapidly shifting nature of scams perpetrated on the internet, the Court should consider how the intent of the Anti-phishing Act applies in this case as well.

The plaintiff states that "plaintiff's agents created a log identifying (Doe 1-265 defendants) by their IP addresses and the dates and times of the their alleged activity." The Court may ask why was the plaintiff logging this activity? If the intent of Smash Pictures and counsel Scott M. Hervey is to pursue legal investigations into alleged copyright violation of "Bridesmaids XXX Porn Parody" with the 590 Doe defendants named in *Case No. 2:12-CV-*

*00302 GEB-GGH* and the 265 Doe defendants named *Case No. 2:12-CV-00301 JAM-CKD* then

Scott M. Hervey should be prepared to file 855 actions against the Doe defendants at a filing

cost of \$350 per civil case x 855 = \$299,250. I do not believe Mr. Hervey actually intends to

pay the district court \$299,250 to pursue these cases within the court system, rather I contend

he plans to harass what individuals he can discover into "settling out of court." It is in this light

that we see plaintiff's agents operating in violation of 22948.2, I condense here inserting

relevant terms.

"It shall be unlawful for any person (**plaintiff's agents**)... through use of the Internet

(**collecting IP addresses**) to take any action to induce another person (**Verizon, Doe**

**defendants**) to provide identifying information (**names, telephone numbers**) by representing

itself to be a business."

I argue that plaintiff's agents by gathering IP addresses are "Phishing." Plaintiff's

agents collect the IP address (e.g. 173.60.8.148) of Bitorrent users in order to threaten frivolous

lawsuits. Plaintiff's attorney Scott M. Hervey is abusing the judicial process and power of

subpoena to pressure ISPs like Verizon to provide identifying information on Verizon

customers. Plaintiff's agents and Scott M. Hervey represent themselves as a legitimate

business. Plaintiffs are not a business seeking justice under a provable point of law and their

action should be considered, at best, frivolous, since the recent court decisions (e.g. *Hard*

*Drive Productions, Inc. v. Does 1-90 case 5:2011cv03825*) repeatedly conclude that IP address-

based suits are unprovable given the limitations of current technology.


Plaintiff's agents notably Scott M. Hervey is "representing itself to be a business"

engaged in fruitful courtroom litigation. While 22948.2 was written with the idea that violators

could pretend to be banks, stores, or familiar name brands on the internet in order to deceive

customers, at that time (2005) no one had yet imagined a process to abuse the legal system and subpoena process into complicity for "Phishing." Plaintiff's agents and Scott M. Hervey's business and business model is now well-recognized enough that WIRED magazine has written an article (*Attachment F*) on 3/31/2011 citing the "courtroom-based business strategy" and specifically mentioning plaintiff's attorney Scott M. Hervey as a leading exponent of this business model and citing Hervey's case targeting 5,865 downloaders of *Nude Nuns With Big Guns* to be a lawsuit "theoretically worth as much as $879,750,000 – more money than the U.S. Box Office gross for *Avatar*." That case was dropped by Hervey when pursuing it became time-consuming litigation which is not part of Hervey's business model *Case 2:11-cv-01949-DDP-FMO*.

Furthermore, if the personally identifying information of DOES 1-265 is presented to plaintiff, based on the history of similar cases, Plaintiff's agents will engage in telephone calls that violate the **Telemarketing and Consumer Fraud and Abuse Prevention Act** (codified in relevant part at 15 U.S.C. §§ 6101-6108)

The Act requires the Commission to promulgate regulations (1) defining and prohibiting deceptive telemarketing acts or practices; (2) prohibiting telemarketers from engaging in a pattern of unsolicited telephone calls that a reasonable consumer would consider coercive or an invasion of privacy; (3) restricting the hours of the day and night when unsolicited telephone calls may be made to consumers; and (4) requiring disclosure of the nature of the call at the start of an unsolicited call made to sell goods or services. The law expressly authorizes the Commission to include within the rules' coverage entities that "assist or facilitate" deceptive telemarketing practices. The Commission's rules can be found at 16 C.F.R. Part 310.

I encourage the Court to consider that while some of the technology has evolved since 2005, the spirit of 22948.2 remains intact. Predatory individuals that seek to extort citizens often begin this process by harvesting some basic information from the internet

(Phishing.). The first and most easily harvested information is the IP address because every citizen connected to the internet will have at least one exposed IP address associated with every computer, modem, printer, and other IP device connected to the internet. Plaintiff agents have "Phished" for IP addresses they contend are linked to copyright violation, a case that they know is unprovable. What plaintiff's attorneys can do is harass any individual whose identity they secure from Verizon in violation of 15 U.S.C. §§ 6101-6108. Unfortunately, one of the most basic legal tools – a subpoena to allow discovery – is being improperly abused by the plaintiff's lawyer, since they do not seek discovery of individual's identity to make a provable case of law, but only to harass citizens to settle out of court as part of a business plan.

Under Rule 11 of the Federal Rules of Civil Procedure, Scott M. Hervey is required to certify that, to the best of the presenter's knowledge and belief, the legal contentions "are warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law" (*Rule 11(b)(2), Federal Rules of Civil Procedure.*) We do not believe Mr. Hervey can credibly plead ignorance of cases like *Hard Drive Productions, Inc. v DOES 1-90, Case5:11-cv-03825-HRL* which were decided to be without merit in California within Mr. Hervey's "specialty" area of law, intellectual property. Mr. Hervey's profile on his website (*attachment G*) cites his "extensive knowledge and experience in trademark and copyright law." If Mr. Hervey is intentionally filing cases that California Courts regularly find without merit, these filings can only be considered frivolous.

Monetary civil penalties for violation of this rule may in some cases be imposed on the litigant or the attorney under Rule 11. In one case, the Seventh Circuit issued an order giving such an attorney "14 days to show cause why he should not be fined $10,000 for his frivolous arguments" *United States v. Patridge, 507 F.3d 1092, 2007-2 U.S. Tax Cas. (CCH) paragr. 50,806 (7th Cir. 2007), cert. denied, 552 U.S. 1280, 128 S.Ct. 1721 (2008).* We encourage the Court to consider sanctions against Scott M. Hervey to discourage him from filing frivolous lawsuits and wasting the Courts time in future.

IN SUMMARY

(1) Because this improper joining of these Doe defendants into this one lawsuit raises serious questions of individual fairness and individual justice, the Court should sever the defendant and "drop" Does 1-265, from the case.

(2) Furthermore, the information that Verizon Online maintains on Does 1-265 should not be released until Verizon Online complies with California 22575, and if Verizon Online meets compliance, Does 1-265 private information should not be released "after the fact."

(3) Lastly, defendants ask the court to consider the behavior of the Plaintiff's agents and Scott M. Hervey under 22948.2, the Anti-Phishing Act of 2005.

**For these three reasons stated above, Does 1-265 motion to quash the plaintiff's subpoena.**

*See* Fed. R. Civ. P. 21.

Dated: 5/4/2012                                         Respectfully submitted,

                                                        *s/John Doe*
                                                        John Doe
                                                        Pro se

## CERTIFICATE OF SERVICE

I hereby certify that on 5/05/2011, I served a copy of the foregoing document and attachments A-G, via US Mail, on:

Carolyn K. Delaney, United States Magistrate Judge
U.S District Court, Eastern District of California
Clerk's Office
4th Floor
United States Courthouse,
501 "I" Street, Sacramento, 95814

and

Verizon Legal Compliance
Custodian of Records
P.O. Box 1001
San Angelo, TX 76902

# Attachment

# A

DOES 1-265, Defendants.  CASE No. S-12-0301 JAM CKD

MOTION TO QUASH SUBPOENA

## **SUBPOENA TO VERIZON**

Copy provided for the convenience of the Court.

4/30/2012

**verizon**

**READ AT ONCE**

COURT-DIRECTED NOTICE
REGARDING ISSUANCE OF SUBPOENA
SEEKING DISCLOSURE OF YOUR IDENTITY

Verizon Online, as your Internet Service Provider, recently received a legal document called a subpoena.  Absent action by you, the subpoena requires us to disclose your name, address and other information.The subpoena was issued pursuant to a Court Order in a lawsuit pending in the United States District Court for the Eastern District of California.

The Plaintiffs have filed a lawsuit alleging that various people have perhaps infringed their copyrights by illegally downloading and/or distributing a movie. However, the Plaintiffs do not know the actual names or addresses of these people – only the Internet Protocol address ("IP address") of the computer associated with the allegedly illegal activity.

Accordingly, Plaintiffs have filed lawsuits against so-called anonymous "John Doe" defendants and issued subpoenas to determine the identity of these people (the so-called "John Does." The Plaintiffs have asked us to disclose your identification information to them, including your name, current (and permanent) addresses, and your email address and Media Access Control number. Enclosed is a copy of the subpoena seeking information and please find the IP address at the end of this letter that has been associated with your computer and showing the date and time you are alleged to have used the Internet to download or upload the (The plaintiffs will have to prove that you illegally used the internet to download or upload the particular movie.  We do not have records that would prove or disprove that fact; we simply have records that show that an IP address was assigned to a specific customer at a specific time. It may be that someone else, for a variety of reasons, was using the IP address).

This is a civil lawsuit, not a criminal case.  You have not been charged with any crime.  If the Plaintiffs receive your information from your Internet Service Provider, you will likely be added as a named defendant to their lawsuit.

INFORMATION ABOUT YOU HAS NOT YET BEEN DISCLOSED.
BUT IT WILL BE DISCLOSED IN 30 DAYS IF YOU DO NOT
CHALLENGE THE SUBPOENA.

Your identifying information has not yet been disclosed to the Plaintiffs.

This notice is intended to inform you of some of your rights and options. It does not provide legal advice. We cannot advise you about what grounds exist, if any, to challenge this subpoena. If you would like legal advice you should consult an attorney. Within this notice you will find a list of resources that may help you locate an attorney and decide how to respond to the subpoena or lawsuit

If you want to prevent being identified, you have 30 days from the date of this notice to file a motion to quash or vacate the subpoena and notify Verizon Online that you have done so. If you need more than 30 days to file such a motion or find a lawyer to assist you, you can file a motion asking for an extension of time; you should notify Verizon Online if you file a motion asking for more time.

The appropriate address to send such notices to Verizon is:

Verizon Legal Compliance
Custodian of Records
P.O. Box 1001
San Angelo, TX 76902

Fax Number: 325-949-6916

Please  provide us with a copy of the filed motion to quash the subpoena, your identity will not be disclosed until the court makes a decision on your motion. If you do nothing, then after 30 days we are compelled to send the Plaintiff your name, address, email address, telephone number, and your modem's Media Access Control number.

You may wish to obtain an attorney to advise you on these issues or to help you take action.

To help you find a lawyer, the American Bar Association's attorney locator can be found on the Internet at http://www.abanet.org/lawyerlocator/searchlawyer.html

The Electronic Frontier Foundation is an organization that seeks to protect the rights of Internet users. They have created a website that lists attorneys who information about the lawsuit that has been filed against you as well as similar lawsuits:

https://www.eff.org/issues/file-sharing/subpoena-defense

If you are interested in discussing this matter with the Plaintiff's attorneys, you may contact them by telephone at 916-558-6000.

But please understand that these lawyers represent the company that is trying to sue you. They can speak with you about settling the lawsuit, if you wish to consider that.  At the same time, you must be aware that if you contact them they may learn your identity, and that anything you say to them can later be used against you in court.

You should not call the Court.

Again, you may wish to retain an attorney to discuss these issues and your options.

AO 88B (Rev. 06/09) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT
### for the
### Northern    District of Texas

Smash Pictures

|  |  |
|---|---|
| *Plaintiff* | ) |
| v. | ) |
| Does 1 through 265, inclusive | ) |
| *Defendant* | ) |

Civil Action No. 2:12-CV-00301JAM-CKD

(If the action is pending in another district, state where:

Eastern District of California   )

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To: The Custodian of Records for VERIZON INTERNET SERVICES
2701 South Johnson Street
San Angelo, Texas 76904

☒ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and permit their inspection, copying, testing, or sampling of the material: See Attachment.

| Place: Verizon Internet Services | Date and Time: |
|---|---|
| 2701 South Johnson Street, San Angelo, TX 76904 | May 11, 2012 |

☐ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|
|  |  |

The provisions of Fed. R. Civ. P. 45(c), relating to your protection as a person subject to a subpoena, and Rule 45 (d) and (e), relating to your duty to respond to this subpoena and the potential consequences of not doing so, are attached.

Date: April 11, 2012

*CLERK OF COURT*

OR

_____
*Signature of Clerk or Deputy Clerk*

_____
*Attorney's signature*
Scott M. Hervey, Esq.

The name, address, e-mail, and telephone number of the attorney representing *(name of party)* Plaintiff, Smash Pictures, A California Corporation _____, who issues or requests this subpoena, are:

Scott M. Hervey, SBN 180188; 400 Capitol Mall, 11th Floor, Sacramento, CA 95814; shervey@weintraub.com; (916) 558-6000

AO-88B

Smash Pictures vs. Does 1 through 265                    Court Case No. 2:12-CV-00301-JAM-CKD

## ATTACHMENT TO SUBPOENA TO PRODUCE INFORMATION

Provide all records and other information relating to each of the <u>IP</u> addresses attached hereto including the following:

In accordance with the conditions in the attached Court Order, provide the name, current (and permanent) addresses, telephone numbers, e-mail addresses and Media Access Control addresses of all individuals whose IP addresses are listed in the attached spreadsheet (paper and CD formats).

1

2

3

4

5

6

7

8             IN THE UNITED STATES DISTRICT COURT

9           FOR THE EASTERN DISTRICT OF CALIFORNIA

10   SMASH PICTURES,

11             Plaintiff,                    CIV. NO. S-12-0301 JAM CKD

12        vs.

13   DOES 1-265,

14             Defendants.                        ORDER

15   _____/

16             Presently before the court is plaintiff's ex parte application for an order shortening

17   time for hearing on a motion to take expedited discovery.  Plaintiff has noticed the motion for

18   hearing on April 4, 2012.  Having reviewed the papers in support of the application and the

19   motion, the court concludes that oral argument would not be of material assistance, vacates the

20   hearing, and submits the matter on the papers.

21   BACKGROUND

22             In this action, filed February 3, 2012, plaintiff alleges copyright infringement of

23   the motion picture titled Bridesmaids XXX Porn Parody ("Motion Picture") against Does 1-265.

24   In the course of monitoring Internet-based infringement of its copyrighted content, plaintiff's

25   agents allegedly observed unlawful reproduction and distribution of the Motion Picture via the

26   Bit Torrent file transfer protocol by the Doe defendants.  Although plaintiff does not know the

1

1 || actual names of the Doe defendants, plaintiff's agents created a log identifying them by their IP
2 || addresses and the dates and times of their alleged unlawful activity.  The IP addresses, internet
3 || service providers ("ISPs"), and dates and times of the alleged unlawful activity by the Doe
4 || defendants are identified in Exhibit 4 to plaintiff's Complaint.

5 ||          According to plaintiff, only the ISPs who issued the IP addresses connected with
6 || the unauthorized activity have the ability to identify the Doe defendants.  Plaintiff contends the
7 || ISPs keep the identifying information for 90 to 180 days.  Thus, plaintiff seeks an order granting
8 || expedited discovery to serve Rule 45 subpoenas on the ISPs to obtain the names, addresses,
9 || telephone numbers, and e-mail addresses of the Doe defendants, thereby permitting plaintiff to
10 || amend its complaint to state the true name of each defendant and serve the proper defendants
11 || with process.

12 || DISCUSSION

13 ||          Generally, Rule 26(d) of the Federal Rules of Civil Procedure provides that "[a]
14 || party may not seek discovery from any source before the parties have conferred as required by
15 || Rule 26(f), except ... when authorized by these rules, by stipulation, or *by court order*."  Fed. R.
16 || Civ. P. 26(d) (emphasis added).  Courts apply a "good cause" standard in considering motions to
17 || expedite discovery.  Semitool, Inc. v. Tokyo Electron Am., Inc., 208 F.R.D. 273, 276 (N.D. Cal.
18 || 2002) ("Semitool").  "Good cause may be found where the need for expedited discovery, in
19 || consideration of the administration of justice, outweighs the prejudice to the responding party."
20 || Id.

21 ||          Good cause for expedited discovery is frequently found in cases involving claims
22 || of infringement and unfair competition or in cases where the plaintiff seeks a preliminary
23 || injunction.  Id.; Pod-Ners, LLC v. N. Feed & Bean of Lucerne Ltd. Liability Co., 204 F.R.D. 675,
24 || 676 (D. Colo. 2002).  Moreover, several unpublished opinions from federal district courts in
25 || California, applying the test in Semitool, found good cause to allow expedited discovery to
26 || ascertain the identities of Doe defendants in copyright infringement actions.  See e.g. UMG

1  Recordings, Inc. v. Doe, 2008 WL 4104207 (N.D. Cal. Sept. 4, 2008); Arista Records LLC v.

2  Does 1-43, 2007 WL 4538697 (S.D. Cal. Dec. 20, 2007).

3          In Arista Records LLC, the plaintiffs alleged that unidentified defendants had used

4  an online media distribution system to download and distribute plaintiffs' copyrighted works to

5  the public without permission.  Arista Records LLC, 2007 WL 4538697, at *1.  Because the

6  plaintiffs were only able to identify each defendant by a unique internet protocol address assigned

7  to that defendant, plaintiffs filed an ex parte application seeking leave to serve immediate

8  discovery on a third-party ISP to identify the Doe defendants' true identities.  Id.  The court

9  found good cause to allow expedited discovery based on the plaintiffs' prima facie showing of

10  infringement, the risk that the ISP would not long preserve the information sought, the narrow

11  tailoring of the requests to the minimum amount of information needed to identify the defendants

12  without prejudicing their rights, and the fact that the expedited discovery would substantially

13  contribute to moving the case forward.  Id.  The court further noted that, without such discovery,

14  plaintiffs could not identify the Doe defendants and would not be able to pursue their lawsuit to

15  protect their copyrighted works from infringement.  Id.

16          Here, plaintiff has similarly demonstrated its need for expedited discovery.

17  Plaintiff obviously cannot conduct a Rule 26(f) conference with unidentified defendants and will

18  need to conduct pre-conference discovery to ascertain the identities of the Doe defendants,

19  amend its complaint, and move the case forward.  There does not appear to be any other way for

20  plaintiff to identify the defendants and pursue the lawsuit to protect its copyrighted Motion

21  Picture.  Given that plaintiff has identified each potential defendant by the IP address assigned by

22  his or her ISP, it seems likely that the requested discovery will identify the unknown defendants.

23  Furthermore, there is some need for exigency given the risk that the information sought may be

24  inadvertently destroyed by ISPs in the ordinary course of business.

25          The need for expedited discovery must of course be balanced against the prejudice

26  to the responding party.  Semitool, 208 F.R.D. at 276.  In this case, the responding parties are

3

1   various ISPs. It is unclear what prejudice the ISPs would suffer if ordered to produce the

2   information plaintiff requests. Exhibit 4 shows 265 IP addresses to be identified by

3   approximately 20 providers. It would not seem to be excessively burdensome for these ISPs to

4   identify such a limited quantity of IP addresses.

5          Moreover, there is little risk of prejudice to the Doe defendants. "Expedited

6   discovery may be inappropriate where defendants are required to unwarily incriminate

7   themselves before they have a chance to review the facts of the case and to retain counsel." Pod-

8   Ners, LLC, 204 F.R.D. at 676 (citations omitted). However, the expedited discovery requested

9   here is narrowly tailored and only seeks the minimum amount of information needed to identify

10  the potential defendants—their names, addresses, telephone numbers, and e-mail addresses.

11  Because the proposed discovery relates only to identifying and contact information, and does not

12  seek early admissions, answers to interrogatories, or depositions during which defendants may

13  "unwarily" incriminate themselves, concerns of undue prejudice are not present here.

14         In sum, good cause exists for expedited discovery in this matter, because

15  plaintiff's need for the discovery outweighs any prejudice to the ISPs or the unidentified potential

16  defendants.

17         Accordingly, IT IS HEREBY ORDERED that:

18         1. Plaintiff's ex parte application and motion for leave to take expedited

19  discovery (dkt. no. 6) is granted;

20         2. Plaintiff may immediately serve Rule 45 subpoenas on the ISPs listed in

21  Exhibit 4 to the Complaint to obtain the following information about the subscribers (Doe

22  defendants) corresponding to the IP addresses listed in the exhibit: their *names, addresses,*

23  *telephone numbers, and e-mail addresses.* Each subpoena shall have a copy of this order

24  attached.

25         3. The ISPs, in turn, shall serve a copy of the subpoena and a copy of this order

26  upon its relevant subscribers within 30 days from the date of service upon them. The ISPs may

4

1 serve the subscribers using any reasonable means, including written notice sent to the
2 subscriber's last known address, transmitted either by first-class mail or via overnight service, or
3 by e-mail notice.

4          4. The subscribers and the ISPs shall each have 30 days from the respective dates
5 of service upon them to file any motions contesting the subpoena (including a motion to quash or
6 modify the subpoena). If that period elapses without the filing of a contesting motion, the ISPs
7 shall have ten (10) days thereafter to produce the information responsive to the subpoena to
8 plaintiff.

9          5. The subpoenaed ISPs shall preserve any subpoenaed information pending the
10 production of the information to plaintiff and/or the resolution of any timely-filed motion
11 contesting the subpoena.

12          6. Any ISP that receives a subpoena pursuant to this order shall confer with
13 plaintiff before assessing any charge in advance of providing the information requested in the
14 subpoena. Any ISP that elects to charge for the costs of production shall provide plaintiff with a
15 billing summary and cost reports.

16          7. Any information disclosed to plaintiff in response to a Rule 45 subpoena may
17 not be used for any improper purpose and may only be used for protecting plaintiff's rights as set
18 forth in the First Amended Complaint.

19 Dated: March 7, 2012

20

21                                    CAROLYN K. DELANEY
                                      UNITED STATES MAGISTRATE JUDGE
22

4
23 smash301.exp.disc

24

25

26

5

# Attachment

# B

DOES 1-265, Defendants.                    CASE No. S-12-0301 JAM CKD

MOTION TO QUASH SUBPOENA

*__Hard Drive Productions, Inc. v. Does 1-90 case 5:2011cv03825__*

Copy provided for the convenience of the Court.

1                                                          ** E-filed March 30, 2012 **

2

3

4

5

6

7

8                        IN THE UNITED STATES DISTRICT COURT

9                     FOR THE NORTHERN DISTRICT OF CALIFORNIA

10                                    SAN JOSE DIVISION

11   HARD DRIVE PRODUCTIONS, INC.,              No. C11-03825 HRL

12                      Plaintiff,              **ORDER DENYING APPLICATION
             v.                                 FOR LEAVE TO TAKE EXPEDITED
13                                              DISCOVERY AND SEVERING DOES
     DOES 1-90,                                 2-90**
14
                       Defendants.              **[Re: Docket No. 6]**
15   _____/

16         This case is one of dozens of "mass copyright violation" cases filed in district courts recently

17   against Doe defendants who allegedly used BitTorrent file-sharing technology to illegally up- and

18   download copyrighted files from the Internet.[1] Here, plaintiff has sued 90 Doe defendants, but

19   lawsuits of this type may include as few as two dozen or as many as two thousand defendants.

20   While each case is unique, they follow a similar pattern.

21

22   _____
     [1] Hard Drive filed 19 cases in this district alone in 2011, many of which have already been
23   dismissed. See, e.g., Hard Drive Productions, Inc. v. Does 1-166, C:11-03682-LHK (N.D. Cal. July
     27, 2011); Hard Drive Productions, Inc. v. Does 1-84, C:11-03648-HRL (N.D. Cal. July 26, 2011);
24   Hard Drive Productions, Inc. v. Does 1-66, C:11-03005-LHK (N.D. Cal. June 17, 2011); Hard Drive
     Productions, Inc. v. Does 1-69, C:11-03004-HRL (N.D. Cal. June 17, 2011); Hard Drive
25   Productions v. Does 1-80, C:11-02535-PSG (N.D. Cal. May 25, 2011); Hard Drive Productions, Inc.
     v. Doe, C:11-05634-PJH (N.D. Cal. Nov. 21, 2011); Hard Drive Productions, LLC v. Doe, C:11-
26   05631-SBA (N.D. Cal. Nov. 21, 2011); Hard Drive Productions, LLC v. Does 1-33, C:11-03827-LB
     (N.D. Cal. Aug. 3, 2011); Hard Drive Productions, LLC v. Does 1-130, C:11-03826-DMR (N.D.
27   Cal. Aug. 3, 2011). Hard Drive's counsel has filed dozens more cases on behalf of similar plaintiffs.
     See, e.g., Pacific Century Int'l, Ltd. v. Does 1-129, C:11-03681-HRL (N.D. Cal. July 27, 2011); AF
28   Holdings LLC v. Does 1-135, C:11-03336-LHK (N.D. Cal. July 7, 2011); Boy Racer, Inc v. Does 1-
     52, C:11-02329-PSG (N.D. Cal. May 5, 2011); Pink Lotus Entertainment, LLC v. Does 1-46, C:11-
     02263-HRL (N.D. Cal. May 6, 2011).

United States District Court
For the Northern District of California

1   The plaintiff claims to own title to one or more copyrights in a film, usually a work of adult

2 entertainment, and claims widespread infringement of its copyright(s) by individuals using the

3 popular file-sharing internet protocol known as BitTorrent. Not knowing the names of these

4 individuals, plaintiff sues "Does," each one represented to be the user of one of the IP addresses[2]

5 that plaintiff claims it observed uploading or downloading the copyrighted work in a single

6 BitTorrent "swarm."

7   In BitTorrent vernacular, an individual downloader is called a "peer." The complete version

8 of the specific file is called a "seed." A peer who shares a seed through BitTorrent is called a

9 "seeder." The seeder creates a file that contains BitTorrent protocol code for how to find the seed (a

10 "torrent file") and uploads the torrent file to a website where peers store such files (a "torrent

11 indexing site"). As additional peers find the torrent file, their BitTorrent programs run the code and

12 begin to download random pieces of the seed file and then upload those pieces to other peers

13 running the torrent file. This exchange of pieces of the seed file between peers is a "swarm." Peers

14 do not choose which pieces are downloaded and uploaded (this is determined by the code in the

15 torrent file), nor do they choose the peers to and from whom they send and receive pieces.

16   After filing suit, the plaintiff requests that the court let it conduct expedited discovery, by

17 subpoenaing the various ISPs whose IP addresses appear in the swarm, ostensibly to identify and

18 name the defendants in the action. Ordinarily, such discovery is prohibited by Fed. R. Civ. P. 26(d).

19 However, plaintiff assures the court that if it will permit this "limited" discovery, the plaintiff can

20 subpoena the ISPs for subscriber information associated with each IP address, and then name and

21 serve the defendants so that the case may go forward.

22   Following the pattern, Hard Drive now seeks limited discovery under Fed. R. Civ. P. 26(d)

23 and Fed. R. Civ. P. 45 in order to identify the 90 Does named in this suit by issuing subpoenas on

24 the relevant ISPs. Dkt. No. 16 ("Application"). Plaintiff has consented to the undersigned's

25

26 [2] IP addresses are unique identifying numbers that Internet Service Providers ("ISPs") assign to their
27 subscribers. Many IP addresses are "dynamic," meaning that they are assigned when a user connects
to the Internet, and they change "from time to time." Dkt. No. 6, Exh. 1 ¶ 16 ("Hansmeier Decl.").
28 Plaintiff contends that "nearly all" of the IP addresses listed in this action are dynamic, though it
does not explain how one can determine the nature of an IP address. See Hansmeier Decl. ¶ 17. ISPs
do keep logs of the IP addresses they assign to their subscribers, at least temporarily. Id.

United States District Court
For the Northern District of California

2

1  jurisdiction pursuant to 28 U.S.C. § 636(b). Based on the Application, supplemental briefing,

2  arguments at hearing, and all applicable authority, the court rules as follows.

### I.   BACKGROUND

4  On August 3, 2011, plaintiff Hard Drive Productions, Inc. ("Hard Drive") filed this lawsuit

5  for copyright infringement against 90 Doe defendants. Dkt. No. 1 ("Complaint"). Hard Drive alleges

6  it owns a copyright for the adult file "Amateur Allure—Natalia" and claims that the defendants

7  illegally distributed the film in a BitTorrent swarm. Plaintiff alleges that it observed all 90 of the

8  Doe defendants in the swarm at some point over a period of 63 days. See Complaint ¶ 8; see also

9  Complaint, Exh. A (listing the 90 IP addresses and the date and time when plaintiff alleges they

10  appeared in the swarm).

11  On August 10, 2011, plaintiff filed an ex parte application for leave to take "*limited*"

12  discovery "*solely* to determine the true identities of Doe Defendants that Plaintiff will fully identify

13  over the course of this litigation." Application p. 8 (italics in original). This court set a hearing on

14  the application, and requested supplemental briefing on three issues: 1) further details on the date(s)

15  and time(s) each IP address appeared in the swarm; (2) to what extent IP addresses provide

16  geographic information; and (3) how plaintiff planned to proceed should its application be granted.

17  The court held a hearing on November 29, 2011.

### II.   LEGAL STANDARD

19  Under Fed. R.Civ. P.  26(d)(1), discovery is not permitted without a court order prior to a

20  conference between the parties as required by Fed. R. Civ. P. 26(f) and then only upon a showing of

21  "good cause." Semitool, Inc. v. Tokyo Electron American, Inc., 208 F.R.D. 273, 275 (N.D. Cal.

22  2002). When considering good cause, courts consider: whether (1) the plaintiff can identify the

23  missing party with sufficient specificity such that the Court can determine that defendant is a real

24  person or entity who could be sued in federal court; (2) the plaintiff has identified all previous steps

25  taken to locate the elusive defendant; (3) the plaintiff's suit against defendant could withstand a

26  motion to dismiss; and (4) the plaintiff has demonstrated that there is a reasonable likelihood of

27  being able to identify the defendant through discovery such that service of process would be

28

United States District Court
For the Northern District of California

1  possible. See Patrick Collins v. John Does 1-54, 2012 U.S. Dist. LEXIS 36232, *8 (D. Ariz. Mar.

2  19, 2012).

3       When plaintiffs do not know defendants' identifies at the time a complaint is filed, courts

4  may grant plaintiffs early discovery to determine the doe defendants' identities "unless it is clear

5  that discovery would not uncover the identities, or that the complaint would be dismissed on other

6  grounds." Gillespie v. Civiletti, 629 F.2d 637, 642 (9th Cir. 1980). In Gillespie, the Ninth Circuit

7  held that the district court abused its discretion in denying early discovery because it was "very

8  likely" that the requested early discovery—interrogatories directed to named defendants—would

9  "have disclosed the identities of the 'John Doe' defendants." Id. at 643; see also Wakefield v.

10  Thompson, 177 F.3d 1160, 1163 (9th Cir. 1999) (quoting Gillespie, 629 F.2d at 642); Young v.

11  Transportation Deputy Sheriff I, 2009 WL 2011201 at *1 (9th Cir. July 6, 2009) (applying the

12  Gillespie standard).

13       **III.   DISCUSSION**

14            A.  The Gillespie Factors

15       Under Gillespie, the court asks whether the requested early discovery is "very likely" to

16  reveal the identities of the Doe defendants. Gillespie, 629 F.2d at 643; AF Holdings LLC v. Does 1-

17  96, No. 11-03335-JSC, Dkt. No. 14 (N.D. Cal. Dec. 1, 2011). Plaintiff agues that its request is "far

18  from unique," and will allow it to "fully 'identify' . . . each [BitTorrent] user suspected of violating

19  the plaintiff's copyright." Application, p. 2. "Once the plaintiff has a doe defendant's contact

20  information, the defendant will be contacted and formally named in the suit, service will be

21  effectuated, and the case will be allowed to proceed." Id. at 2-3. However, at the November 29

22  hearing, plaintiff's counsel told quite a different story about how events would proceed if limited

23  early discovery were granted.

24       Although plaintiff contends that it will "fully identify" the Doe defendants if it can subpoena

25  the ISPs for subscriber information, the subpoena is only the first step in a lengthy extra-judicial

26  investigation that may or may not lead to naming any Doe defendants in this lawsuit. In response to

27  a subpoena, the ISP produces the identity and contact information of the subscriber associated with

28  a particular IP address. This subscriber may be the infringer who participated in the swarm, or he

United States District Court
For the Northern District of California

4

1  may just be the person who pays for internet access in a given household. Multiple people may, and

2  often do, use a single ISP subscription—family members, roommates, guests, or other individuals

3  (unknown to the subscriber) who access the internet using any unprotected wireless signals they can

4  find. The named ISP subscriber may or may not be the infringer, as plaintiff acknowledges by

5  saying that it may need to take further discovery even after it locates the subscribers whose IP

6  addresses appeared in the swarm. Dkt. No. 16, p. 4.

7  Plaintiff argues that only by subpoenaing the ISPs can it begin the process of identifying Doe

8  defendants. Dkt. No. 6, p. 8. Once it receives subscriber information from the ISPs, plaintiff sends

9  each ISP subscriber a letter of "introduction" that may contain a settlement demand.[3] Presumably,

10  this letter informs the subscriber that he has been named in a lawsuit for infringement of a

11  copyrighted pornographic work, and suggests that plaintiff intends to name him in the lawsuit. Next,

12  if the subscriber is amenable to communicating with plaintiff, they may "meet and confer" to

13  discuss the litigation. If it has not already done so, plaintiff may then extend a settlement demand. If

14  the subscriber refuses to settle, or denies responsibility in the matter, plaintiff conducts "research" to

15  find out more information about the subscriber (and other users of his ISP subscription). The

16  plaintiff asks all subscribers to offer "a valid defense that is substantiated by credible evidence."

17  Dkt. No. 16, p. 4. If a subscriber can offer such a defense, plaintiff says it will drop its case against

18  that person. If the subscriber cannot provide a so-called "valid defense," plaintiff "will likely serve

19  and name" him with process. If the subscriber alleges that some other user of his ISP subscription is

20  responsible, the plaintiff might serve the other user. Plaintiff finally states that if a subscriber

21  "deliberately evades" plaintiff's attempts to meet and confer, then plaintiff might need to request

22  further discovery. Dkt. No. 16, p. 4.

23  Thus, plaintiff will only consider naming and serving a defendant after it has (1) contacted

24  the ISP subscriber one or more times, (2) researched that subscriber and anyone else who might

25

26  [3] In its Application, plaintiff says nothing about making settlement demands to Does, and states unequivocally that, upon receipt of ISP subscriber information, plaintiff will name and serve the
27  Does in this action. Dkt. No. 6, pp. 2-3. But, in plaintiff's supplemental briefing, it admits that it "may" extend offers of settlement to Does before it decides whether to serve them. Dkt. No. 16, p. 4.
28  In response to the court's questions at the hearing, plaintiff equivocated about when subscribers receive settlement demands, but indicated that all subscribers receive such demands before plaintiff decides whether to name them as defendants.

United States District Court
For the Northern District of California

5

1 have used the ISP subscription, (3) met and conferred with the subscriber; (4) attempted to settle
2 with the subscriber, (5) elicited evidence of a defense from the subscriber, (6) evaluated the
3 credibility of that evidence, and (7) found it wanting. In addition, plaintiff also admits that in the
4 event that a subscriber refuses to "participate" in the above process, plaintiff may need to request
5 further discovery. It is abundantly clear that plaintiff's requested discovery is not "very likely" to
6 reveal the identities of the Doe defendants. Indeed, plaintiff admitted at the hearing that neither it
7 nor any other plaintiff it is aware of has ever served a single defendant in one of these cases where
8 early discovery has been granted.[4]

9     Accordingly, because plaintiff has not shown that the requested discovery is at all likely to
10 uncover the identity of the Doe defendants, its application for leave to take expedited discovery
11 must be denied.

12                B. The Semitool Good Cause Analysis

13     Not only does the Application not meet the "very likely" standard of Gillespie, neither does
14 it establish "good cause" under Fed. R. Civ. P. 26(d)(1) and Semitool.

15                       *1. Identification of Missing Parties as Persons Who Can Be Sued*

16     To satisfy this factor, the plaintiff must "identif[y] the Doe Defendants with sufficient
17 specificity such that the Court can conclude that each Defendant is a real person or entity that would
18 be subject to the Court's jurisdiction." AF Holdings LLC v. Does 1-96, 2011 U.S. Dist. LEXIS
19 134655, *6 (N.D. Cal. Nov. 22, 2011). This includes a showing that personal jurisdiction exists over
20 the defendants. See id.; Berlin Media Art v. Does 1 - 654, 2011 U.S. Dist. LEXIS 120257, *4 (N.D.
21 Cal. Oct. 18, 2011).

22     Plaintiff alleges in the complaint that it "used geolocation technology to trace the IP
23 addresses of each Defendant to a point of origin within the State of California. . . . Although not a
24 litmus test for personal jurisdiction, the use of geolocation gives Plaintiff good cause for asserting

25

26 [4] According to this court's research, at the time of the hearing 69 mass copyright infringement cases had been filed in this district. Of those, plaintiff obtained early discovery in 57 cases and issued
27 subpoenas to obtain subscriber information for more than 18,000 IP addresses, No defendant has been served in any of these cases. See also Patrick Collins v. John Does 1-54, 2012 U.S. Dist.
28 LEXIS 36232 (D. Ariz. 2012), *5, fn. 4 (citing AF Holdings v. Does 1-135, CV-11-1333-LHK (N. D. Cal. Feb. 24, 2012)) (noting that plaintiffs in these cases have never served a defendant in any action where early discovery was granted).

United States District Court
For the Northern District of California

6

1   that personal jurisdiction is proper over the Defendants." Complaint ¶ 3. But, in its supplemental

2   briefing and at hearing, plaintiff admitted that while geolocation "is the leading method for

3   associating an IP address with an approximate geographic location," it is only truly reliable when

4   predicting the *country* in which an IP address is located. Dkt. No. 16, p. 3.

5           Hard Drive alleges "in the alternative" that personal jurisdiction over any non-resident

6   defendants is appropriate because "they downloaded copyrighted content from, or uploaded it to,

7   California residents." Id. ¶ 4. Due process requires that a court only exercise personal jurisdiction

8   over a nonresident defendant if that defendant has "minimum contacts" with the forum state such

9   that maintenance of the suit does not offend traditional notions of fair play and substantial justice.

10   Int'l Shoe Co. v. Wash., 326 U.S. 310, 316 (1945). Each defendant's contacts with the forum state

11   are evaluated individually. Calder v. Jones, 465 U.S. 783, 790 (1984). If the nonresident defendant's

12   activities within the state are "substantial" or "continuous and systematic," there is a sufficient

13   relationship between the defendant and the forum state to support general personal jurisdiction. Data

14   Disc, 557 F.2d at 1287. If the defendant's activities in the forum state are not "substantial" or

15   "continuous," limited jurisdiction only exists if there is a sufficient relationship between the

16   defendant's contacts with the forum state and the claim at issue. Id.

17           Here, plaintiff urges the court to accept its assertion that the Doe defendants are California

18   residents based on its use of geolocation technology. However, plaintiff acknowledged at the

19   hearing that geolocation cannot reliably predict an IP address's state of origin. Moreover, plaintiff's

20   counsel acknowledged that in cases where early discovery was granted, plaintiff often learned that

21   some of the ISP subscribers did not live in the state where the lawsuit was brought. In light of these

22   facts, the court cannot conclude that plaintiff has made even a prima facie showing that the Doe

23   defendants reside in California. Therefore, the court must ask whether plaintiff has alleged

24   minimum contacts sufficient to support the exercise of general or specific personal jurisdiction over

25   any non-resident defendants. The complaint, which summarily asserts that the defendants

26   "downloaded copyrighted content from, or uploaded it to, California residents, and thus committed

27   copyright infringement," is insufficient to support the exercise of general or limited personal

28   jurisdiction. The complaint does not allege that the Does were in the swarm at the same time, or that

United States District Court
For the Northern District of California

7

1  any of them transferred pieces of the copyrighted work to a California resident. Even if plaintiff
2  could show that each of the Doe defendants transferred a piece of the file to a California resident,
3  this single, miniscule action would not constitute "minimum contacts" with the state of California.
4  In the absence of a showing that minimum contacts exist for each Doe defendant, the court cannot
5  exercise personal jurisdiction over the defendants.

6  Additionally, the court is concerned that plaintiff's activities in pursuit of settlement
7  agreements with these and other Doe defendants constitute a serious misunderstanding of
8  jurisdictional limits and potential abuse of the judicial system. At the hearing, plaintiff's counsel
9  disclosed that the information received in response to subpoenas to ISPs is sent to a database where
10  all subscriber information discovered in all of plaintiff's lawsuits is maintained. Plaintiff's counsel
11  assured the court that he would only receive subscriber information from the database for
12  subscribers located in California. However, plaintiff's counsel did not know whether counsel for
13  Hard Drive in other states might send letters to non-California subscribers revealed through
14  discovery in this case, telling them that they have been sued here in California and proposing
15  settlement. As discussed above, this court has no basis for exercising jurisdiction over non-residents
16  who lack minimum contacts with this state. Accordingly, any attempt by plaintiff to convince non-
17  California residents, identified through discovery in this case, to settle rather than be sued in
18  California would be a misuse of that discovery.

19  ### 2. *Previous Steps Taken to Locate Defendants*

20  In mass copyright cases like this one, there is little plaintiff can do to "locate" defendants,
21  since IP addresses are the only identifying feature plaintiffs can collect. This court has previously
22  required plaintiffs to state the date and time of the alleged infringing activity, which plaintiff has
23  done here. See Berlin Media Art e.k. v. Doe, 2012 U.S. Dist. LEXIS 7888, 6 (N.D. Cal. Jan. 24,
24  2012). Accordingly, this court agrees that plaintiff appears to have taken what steps it can to locate
25  defendants.

26  ### 3. *Withstanding a Motion to Dismiss*

27  To prevail on a claim of copyright infringement," plaintiff must prove (1) that it owns a valid
28  copyright, and (2) that each defendant copied a work covered by the copyright. Berlin Media Art

United States District Court
For the Northern District of California

8

1 e.k. v. Doe, 2012 U.S. Dist. LEXIS 7888, 6-7 (N.D. Cal. Jan. 24, 2012) (citing Online Policy Group

2 v. Diebold, Inc., 337 F.Supp.2d 1195, 1199 (N.D. Cal. Sep. 30, 2004). "To be liable for direct

3 infringement, one must actively engage in and directly cause the copying." Id. While the plaintiff

4 has alleged that it owns a valid copyright and that defendants copied the copyrighted work, the court

5 concludes that the complaint could and should be dismissed for misjoinder as to all but a single Doe

6 defendant. Diabolic Video Prods. v. Does 1-2099, 2011 U.S. Dist. LEXIS 58351, *9 (N.D. Cal. May

7 31, 2011). While "joinder of claims, parties and remedy is strongly encouraged," Fed. R. Civ. P. 20

8 sets forth specific standards for permissive joinder. Under Rule 20, parties may be joined in a single

9 lawsuit where the claims against them arise from a single transaction or a series of closely related

10 transactions. If misjoinder is apparent, Fed. R. Civ. P. 21 is clear that misjoinder "is not a ground for

11 dismissing an action." But while an action may not dismissed for misjoinder, a court may, on just

12 terms, drop a party at any time *sua sponte*. MCGIP, LLC v. Doe, 2011 U.S. Dist. LEXIS 108109, *5

13 (N.D. Cal. Sept. 16, 2011) (citing Coughlin v. Rogers, 130 F.3d 1348, 1351 (9th Cir. 1997)); Fed. R.

14 Civ. P. 21. See also Diabolic Video Prods. V. Does 1-2099, 2011 U.S. Dist. LEXIS 58351 at *9

15 (applying this standard for joinder to a similar mass copyright complaint and severing all but the

16 first Doe defendant).

17      Multiple courts have held that "the mere allegation that defendants have used the same peer-

18 to-peer network to infringe a copyrighted work is insufficient to meet the standards for joinder set

19 forth in Rule 20." Berlin Media Art e.k. v. Doe, 2012 U.S. Dist. LEXIS 7888, *7-8) (citing Diabolic

20 Video Productions, Inc. v. Does 1-2099, 2011 U.S. Dist. LEXIS 58351 at *3)). Alleging that

21 defendants used a BitTorrent "swarm" does not itself prove that defendants engaged in "concerted

22 activity." Boy Racer v. Does, 2011 U.S. Dist. LEXIS 86746, *8 (N.D. Cal. Aug. 5, 2011). Although

23 plaintiff argues that the defendants' presence in the same BitTorrent swarm satisfies the standard for

24 joinder, this allegation is insufficient to show that defendants engaged in concerted activity in a

25 single transaction or closely related transactions, and warrants dismissal of improperly joined

26 defendants.

27      Some courts have deferred the question of joinder and severance until after discovery has

28 been authorized and a motion to quash has been filed. See, e.g., Call of the Wild Movie, LLC v.

9

1    Does 1-1062, 770 F. Supp. 2d 332, 339 (D.D.C. 2011). In Call of the Wild, the court accepted the

2    proposition that BitTorrent protocol "'makes every downloader also an uploader of the illegally

3    transferred file(s)'" and found joinder satisfied for purposes of permitting early discovery. Diabolic

4    Video Prods. v. Does 1-2099, 2011 U.S. Dist. LEXIS 58351, *12 (quoting id.). The Diabolic court

5    found that this proposition was too tenuous to justify early discovery of thousands of ISP

6    subscribers' identities. Id. at 12-13. Rather, the Diabolic court considered joinder alongside the ex

7    parte application for early discovery, and this court finds it appropriate to do the same.[5]

8        Here, plaintiff has failed to allege that its claims against the 90 Doe defendants arise from "a

9    single transaction or a series of closely related transactions." Instead, plaintiff provides a list of all

10   90 Doe defendants, identified by IP addresses, and the date and time they each appeared in the

11   swarm over a period of 63 days. See Complaint, Exh. A. Plaintiff also alleges that each Doe

12   defendant "entered the same exact BitTorrent swarm and "reproduced and distributed the Video to

13   multiple third parties." Complaint ¶ 29. But, plaintiff's counsel admitted at the hearing that plaintiff

14   could not truthfully allege that any of the Doe defendants actually transferred pieces of the

15   copyrighted work to or from *one another*. Rather, plaintiff's counsel could only argue that

16   "probability" suggests these Doe defendants received pieces of the work from each other. This court

17   finds plaintiff's probability argument illogical for two reasons: 1) each Doe defendant appeared in

18   the swarm on a different date and time, hours, days, or weeks apart from one another; and 2)

19   BitTorrent's appeal stems from the speed with which peers can download complete files, so it is

20   extremely unlikely that one Doe would remain in the swarm long enough to have direct contact with

21   another Doe who entered hours later. Plaintiff has not shown that the defendants acted in concert

22   simply by appearing the same swarm at completely different times. Therefore, the court cannot find

23   that "a single transaction or series of closely related transactions" connects these 90 Does and makes

24   joinder proper.

25

26

27   [5] Indeed, simultaneous consideration of the application for early discovery and joinder has become
the norm for courts in this district faced with similar cases. See, e.g., Hard Drive Prods. v. Doe,
28   2011 U.S. Dist. LEXIS 89858 (N.D. Cal. Aug. 12, 2011); Boy Racer v. Does, 2011 U.S. Dist.
LEXIS 86746 (N.D. Cal. Aug. 5, 2011); Diabolic Video Prods. v. Does 1-2099, 2011 U.S. Dist.
LEXIS 58351 (N.D. Cal. May 31, 2011).

United States District Court
For the Northern District of California

10

1    Because plaintiff is unable to allege that the Doe defendants acted in concert, joinder is

2  improper and the complaint should be dismissed against Does 2-90 for misjoinder. Not only does

3  this counsel against granting plaintiff's Application, it warrants severance of Does 2-90.

4  Accordingly, Does 2-90 are SEVERED from the action without prejudice to plaintiff to file

5  individual complaints against them.

6        4.  *Likelihood that Expedited Discovery Will Lead to Missing Parties' Identities*

7            *and Service of Process*

8    As discussed above, it is evident that expedited discovery will not lead to identification of

9  the Doe defendants or service of process. Indeed, the fact that no defendant has ever been served in

10  one of these mass copyright cases belies any effort by plaintiff to allege that the discovery *will* lead

11  to identification of and service on the Doe defendants.

12    In light of the first Gillespie factor that plaintiff show it "very likely" that discovery would

13  lead to identification of the Doe defendants, as well as the issues raised by consideration of the

14  Semitool "good cause" analysis, the plaintiff's Application is DENIED.

15  **IV.  CONCLUSION**

16    The court realizes that this decision may frustrate plaintiff and other copyright holders who,

17  quite understandably, wish to curtail online infringement of their works. Unfortunately, it would

18  appear that the technology that enables copyright infringement has outpaced technology that

19  prevents it. The court recognizes that plaintiff is aggrieved by the apparent infringement and is

20  sympathetic toward its argument that lawsuits like this one are the only way for it to find and stop

21  infringers. However, the court will not assist a plaintiff who seems to have no desire to actually

22  litigate but instead seems to be using the courts to pursue an extrajudicial business plan against

23  possible infringers (and innocent others caught up in the ISP net). Plaintiff seeks to enlist the aid of

24  the court to obtain information through the litigation discovery process so that it can pursue a non-

25  judicial remedy that focuses on extracting "settlement" payments from persons who may or may not

26  be infringers. This the court is not willing to do.

27    Based on the foregoing, IT IS ORDERED THAT:

28    1.  Plaintiff's Application for Leave to Take Expedited Discovery is DENIED; and

11

1     2.  Does 2-90 are SEVERED from this action without prejudice to plaintiff to file individual

2         complaints against them.

3

4   Dated: March 30, 2012

5                          HOWARD R. LLOYD
                          UNITED STATES MAGISTRATE JUDGE

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
For the Northern District of California

12

United States District Court
For the Northern District of California

1 | **C11-03825 HRL Notice will be electronically mailed to:**

2 | Brett Gibbs                      blgibbs@wefightpiracy.com

3 | **Counsel are responsible for distributing copies of this document to co-counsel who have not
4 | registered for e-filing under the court's CM/ECF program.**

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# Attachment
# C

DOES 1-265, Defendants.                    CASE No. S-12-0301 JAM CKD

MOTION TO QUASH  SUBPOENA

## *VERIZON ONLINE PRIVACY POLICY*

Copy provided for the convenience of the Court.

Residential    Business    Wireless                                                    CALIFORNIA | Español   My Verizon

**All Verizon**                          **Search Site & Support**

# Privacy Policy

**Privacy Policy**

## Verizon is Committed to Protecting Your Privacy

Protecting our customers' privacy is an important priority at Verizon and we are committed to maintaining strong and meaningful privacy protections. The privacy of your information is a significant responsibility and we value the trust you place in us.

Our Privacy Policy is designed to inform you about the information we collect, how we use it, and your options with regard to that collection and use.

This policy applies to Verizon customers in the United States and to visitors to Verizon websites. For Verizon Business customers outside the United States, policies are set forth at http://www.verizonbusiness.com/terms/. Also, contracts between Verizon and its business customers (both U.S. and international) may contain additional privacy-related terms and conditions. Except as described above, this policy applies across the Verizon family of companies and the products and services they provide.

In addition to the privacy practices described in this policy, please note that there are additional privacy practices that apply for specific services. They can be viewed at the following links:

Verizon FiOS TV
Verizon Wireless

Back to Summary

## Information We Collect and How We Use It

We collect and use information about you in the following ways:

**Information Collected When You Communicate with Verizon:**
When you communicate with Verizon, we collect information from you that we use to deliver, provide, confirm, change, bill, monitor, maintain and repair your products and services. This information is also used to resolve issues with your order, with our products and services, or with your account. The information we collect may include your name, addresses, and other contact information; the reason for the contact; and your Social Security Number and payment information. We use this information to establish and maintain your customer account and billing records (including establishing credit), provide services to you, authenticate you, and contact you about products and services that we offer.

When you call us, e-mail us, or use the "Live Chat" feature on our websites, we may monitor or record that communication or keep a record of the transaction to help us train employees and provide high-quality customer service.

**Information Collected When You Use Verizon Products and Services:**
We collect information about your use of our products and services. Information such as call records, websites visited, wireless location, application and feature usage, network traffic data, service options you choose, mobile and device number, and other similar information may be used for billing purposes, to deliver and maintain products and services, or to help you with service-related issues or questions. In addition, subject to any legal restrictions that may apply, this information may be used for other purposes such as providing you with information about product or service enhancements, determining your eligibility for new products and services, and marketing to you

based on your use of your products and services. This information may also be used to: (1) manage and protect our networks, services and users from fraudulent, abusive, or unlawful uses; and (2) subject to consent practices described in this policy, help us improve our services, research and develop new products, and offer promotions and other services. This type of information may be aggregated or anonymized for business and marketing uses by us or by third parties.

If you subscribe to Verizon Internet access services such as Verizon Online High Speed Internet, Verizon FiOS Internet or Verizon Wireless Mobile Broadband and Mobile Internet services, we may automatically measure and monitor network performance and the performance of your Internet connection to improve your, or our, overall service levels. If you contact us for service support, we also may access information about your computer, wireless device or other device settings to provide customized technical support or to install specific applications or services that you use or that are necessary to the applications or services you use.

If Verizon intends to gather information from your use of our Internet access services to direct customized advertising specifically to you based on your visits over time and across different non-Verizon websites, we will provide you with notice of our plan and obtain your affirmative consent.

Please note that Verizon is not responsible for information, content, applications or services provided by others. Before you access, use, link to or download a service or application on your computer or wireless device, you should review the associated terms of service and privacy policy. Personal information you submit in these contexts may be read, collected or used by the service or application provider and others associated with these forums in a manner different from that described here.

**Information Provided to Us by Third Parties:**
When you purchase products or apply for service with us, we may obtain credit information about you from outside credit reporting agencies to help us with customer authentication and credit-related decisions.

### Other Privacy & Policy Links

Privacy Policy Summary
**Privacy Policy**
Privacy Officer Message
Recent Changes to the Policy
Tips for Guarding Your Information
FiOS TV Subscriber Privacy Notice
Browser Policy Statement
Your California Privacy Rights
Your Ohio Rights & Responsibilities

### TRUSTe Privacy Program

**Verizon Participates in the TRUSTe Privacy Program**

The TRUSTe seal confirms that Verizon is a licensee of the TRUSTe Privacy Program. TRUSTe is an independent organization that seeks to build users' trust and confidence in the Internet by promoting the use of fair information practices. Verizon wants you to feel confident about your privacy when you use our Web sites (verizon.com, verizonmarketing.com, verizonwireless.com, mci.com, verizonbusiness.com, vzw.com, vzwshop.com, and verizon.net) so we ask TRUSTe to review these sites to ensure compliance with its guidelines.

Please contact us if you have questions or concerns regarding our privacy policy. If you have not received acknowledgement of your inquiry or your inquiry has not been addressed satisfactorily, you should contact TRUSTe

who then will serve as a liaison to help resolve your concerns.

The TRUSTe program covers only information that is collected through Verizon's Web sites and does not cover information that may be collected through software downloaded from the sites.

### Better Business Bureau OnLine

**Verizon is accredited by the Better Business Bureau OnLine (BBBOnLine)**

The BBBOnLine seal confirms that Verizon is an accredited business that abides by the BBB's Code of Business Practices. This Code represents sound advertising and selling practices that enhance customer trust and confidence in a

Verizon obtains information from outside companies that collect consumer information such as demographic and interest data. Examples of this information include gender, age range, sports enthusiast, frequent diner or pet owner. We use this data and combine it with other information we have about you to help us predict customer preferences and to direct marketing offers that might be more relevant to you.

business. With regard to safeguarding privacy, the BBB Code requires accredited businesses to protect any data they collect against mishandling and fraud, collect personal information only as needed, and respect the preferences of customers regarding the use of their information.

We may also obtain contact information and other marketing lead information from third parties, and may combine it with information we have to contact you or direct Verizon's marketing offers to you. Website visitors may provide us with your email address through "refer-a-friend" options. We use these email addresses to send Verizon promotional marketing information.

**Information Collected on Verizon Websites:**
When you browse Verizon websites, information is collected about your device and your visit. We also collect data about your browsing, searching and buying activity as you interact with our sites. We may collect and use your IP address, mobile telephone or device number, account information, web addresses of the sites you come from and go to next and information about your connection, including your device's browser, operating system, platform type and Internet connection speed. We use this information for operational and performance measurement purposes including monitoring statistics such as how many people visit our websites; which pages people visit on our sites; how much time is spent on each page or; which browsers are used to visit our sites.

When you establish an online account with us, we maintain information about your user identification and password. This information is used to identify you when you sign in to your account.

Verizon and its vendors also use information collected on Verizon websites to help us deliver more relevant Verizon marketing messages. These messages may be delivered on our websites, on non-Verizon websites, by our representatives, via email, or via other Verizon services or devices. We use this information in order to, among other things, ensure that you see the correct products and pricing available in the geographic area in which you live, manage the frequency with which you see an advertisement, tailor advertisements to better match your interests, and to understand the effectiveness of our advertising. We also may use this information to assess the effectiveness of our sites and to help you should you request help with navigation problems on these sites.

Certain Verizon vendors may place and read cookies on our sites to help us deliver Verizon marketing messages on our sites and on non-Verizon sites. We require that these vendors provide consumers with the ability to opt-out of their collection of information. You

should see this icon ▷ in or around Verizon advertisements that are delivered on other sites using information collected on our sites. Clicking on this icon will provide information about the companies and data practices that were used to deliver the ad and will also describe how you may opt-out of these advertising programs. Additional information on the choices available to you for the use of your information for advertising purposes can be found in the "How to Limit the Sharing and Use of Your Information" section below.

Additional information about "cookies" and "web beacons"

Back to Summary

**Information You Provide:**
When you contact us online or by other means for information about products and services or when you enter a Verizon-sponsored or affiliated contest, we will respond to your request and may use the information you supply us to provide you with additional information about service offerings either at that time or in the future. Information you provide on our websites about your preferred location and other preferences may be used to provide you with more relevant product recommendations, services and special offers.

If you provide information to us in the context of an event that Verizon sponsors with another organization, such as a contest or sweepstakes, or if you visit a co-sponsored site or use a co-sponsored service, you also may be providing information to the co-sponsor. You should refer to that co-sponsor's privacy policy for information about its practices which may differ from Verizon's practices.

We may also collect information from you when you agree to participate in surveys or provide other feedback to us regarding our products or services, when you register to receive news or public policy updates, or when you apply for a job with or a grant from Verizon. We use this information only for the purpose for which you provide it.

Verizon may send you emails that communicate information about your account or about products, services, marketing offers, or promotions that may be of interest to you. When you open a Verizon email or click on links within these emails, we may collect and retain information to provide you with future communications that may be more interesting to you. Please note that Verizon will not ask you to send us, via email, sensitive personal or account information.

Back to Summary

## Additional Information for Wireless Customers

Verizon Wireless collects and uses mobile device location data for a variety of purposes, including to provide our mobile voice and data services, emergency services, and our and third-party location-based applications and services such as navigation, weather, mapping and child safety applications or tools. Where we offer our own location-based applications, we provide you with notice and choice about whether specific location-tracking features available on your phone are turned on.

Many types of wireless applications and services use mobile device location data, including applications provided by other companies and wireless device operating systems. When you are considering new applications or services, you should carefully review the location-based services' or application providers' privacy policies to learn how they collect and use your information.

Verizon Wireless may use mobile usage information and consumer information for certain business and marketing reports. Mobile usage information includes the addresses of websites you visit when you use our wireless services. These data strings (or URLs) may include search terms you have used. Mobile usage information also includes the location of your device and your use of applications and features. Consumer information includes information about your use of Verizon products and services (such as data and calling features, device type, and amount of use) as well as demographic and interest categories provided to us by other companies (such as gender, age range, sports fan, frequent diner, or pet owner). We may combine this information in a manner that does not personally identify you and use it to prepare aggregated business and marketing reports that we may use ourselves or share with others for their use. We may also share location information with other companies in a way that does not personally identify you so that they may produce business and marketing reports. You have a choice about whether your information is included in these reports.

Verizon Wireless does not publish directories of our customers' wireless phone numbers, and we do not provide or make them available to third parties for listing in directories unless you request that we do so.

Back to Summary

## Additional Information for FiOS TV Service Customers

Specific cable-related privacy protections apply to Verizon's collection, use and disclosure of certain information about our FiOS TV subscribers. We provide you with a FiOS TV privacy notice regarding these specific protections when you first order FiOS TV service and annually thereafter. The FiOS TV privacy notice describes, among other things, the nature of the personally identifiable information we collect, how we may use this personally identifiable information, and under what circumstances and to whom we may disclose personally identifiable information.

Back to Summary

## Information We Share

**Information Shared Within the Verizon Family of Companies:**
Verizon shares customer information within our family of companies for operational purposes. We also share certain types of customer information within our family of companies for our own marketing purposes unless you advise us not to share. Sharing this information allows us to provide you with the latest information about our products and services and to offer you our latest promotions. Special provisions apply with respect to the sharing of FiOS TV customer information among affiliates.

There are additional protections that apply with regard to certain information we collect and maintain about the telecommunications and Voice over Internet Protocol (VoIP) services you buy from us and how you use them. This information is categorized by the federal government as Customer Proprietary Network Information or CPNI. Specific laws govern our sharing and use of this type of information.

Verizon Wireless and Wireline residential customers as well as Verizon Wireline small and medium business customers receive a privacy notice regarding CPNI when they first contract for or order service and every two years thereafter. For more information, please read the Verizon Wireline and Verizon Wireless CPNI notices. You may choose to opt out of the sharing of your CPNI within the Verizon family of companies for certain marketing purposes.

Our corporate and government account customers in the United States receive a CPNI consent form or service agreement requesting affirmative approval to share CPNI information. As described in the request, you may decline or withdraw CPNI consent by not signing the consent form or by following instructions in the consent form or service agreement. Your choice on CPNI consent will remain in effect unless you change it.

If you are an Arizona resident, as required by state law, Verizon Wireless does not share your CPNI within the Verizon family of companies unless you provide consent using a form. Customers who provide such consent are reminded annually of their current CPNI choices.

If you are a retail customer of MCI, your CPNI will not be shared within the Verizon family of companies for marketing purposes except to provide you with information about other services of the type you currently buy from us. In addition, when you are speaking with a customer service representative, we may ask your permission to review your records, including your CPNI, to provide you with information about the full array of services provided by the Verizon family of companies.

**Information Shared Outside the Verizon Family of Companies:**
Except as explained in this Privacy Policy, in privacy policies for specific services, or in agreements with our customers, Verizon does not sell, license or share information that individually identifies our customers, people using our networks, or website visitors with others outside the Verizon family of companies for non-Verizon purposes without the consent of the person whose information will be shared.

Verizon uses vendors and partners for a variety of business purposes such as to help us offer, provide, repair and bill for services we deliver to you. We share information with those vendors and partners to the extent reasonably necessary for them to perform work on our behalf. For example, we may provide your credit card information and billing address to our payment processing company solely for the purpose of processing payment for a transaction you have requested. We require that these vendors and partners protect the customer information we may provide to them and limit their use of Verizon customer data to the purposes for which it was provided. We do not permit these types of vendors and partners to use this information for their own marketing purposes.

As described in more detail in other sections of this policy, Verizon also may share certain information with outside companies to assist with the delivery of advertising campaigns, or preparing and sharing aggregate business and marketing reports.

Verizon provides the names, addresses and telephone numbers of wireline telephone subscribers to directory publishers and directory assistance services unless a non-published or non-listed phone number has been requested.

We may disclose information that individually identifies our customers or identifies customer devices in certain circumstances, such as:

- to comply with valid legal process including subpoenas, court orders or search warrants, and as otherwise authorized by law;
- in cases involving danger of death or serious physical injury to any person or other emergencies;
- to protect our rights or property, or the safety of our customers or employees;
- to protect against fraudulent, malicious, abusive, unauthorized or unlawful use of or subscription to our products and services and to protect our network, services, devices and users from such use;
- to advance or defend against complaints or legal claims in court, administrative proceedings and elsewhere;
- to credit bureaus or collection agencies for reporting purposes or to obtain payment for Verizon-billed products and services;
- to a third-party that you have authorized to verify your account information;
- to outside auditors and regulators; or
- with your consent.

If you purchase services offered jointly by Verizon and one of our partners, customer information may be received by both Verizon and our partner that is providing your service. For these jointly offered services, you should also review the partner company's privacy policy which may be different from those described here.

If Verizon enters into a merger, acquisition or sale of all or a portion of its assets or business, customer information will also be transferred as part of or in connection with the transaction.

**Information Provided to or Used by Third-Party Advertising Entities**

You may see third-party advertisements on some Verizon websites, services, or devices. Some advertisements are chosen by companies that place advertisements on behalf of other third-party advertisers. These companies, often called ad servers or ad networks, may place and access cookies on your device to collect information about your visit on our websites. The information they collect from our sites is in a form that does not identify you personally. This information may be combined with similar data obtained from other websites to help advertisers better reach their targeted audiences. Targeting may be accomplished by tailoring advertising to interests that they infer from your browsing of our sites and your interaction with other websites where these ad servers or ad networks also are present.

If you choose to interact with specific advertisers who advertise on our sites, the information you provide to them is subject to the conditions of their specific privacy policies. In addition, responding to or interacting with a particular advertisement, may result in you later receiving a targeted advertisement on our websites or on other sites as a result of an ad server or ad network concluding that you fit within a particular audience an advertiser is trying to reach.

Advertising that is customized based on predictions generated from your visits over time and across different websites is sometimes called "online behavioral" or "interest-based" advertising. We require that companies disclose when they are using online behavioral advertising programs to deliver third-party ads on our sites or collecting information about your visit to our sites for these purposes and give consumers the ability to opt-out of this use of their information. You will see an icon ▷ in or around third-party advertisements that are delivered on our sites using behavioral advertising programs. Clicking on this icon will provide additional information about the companies and data practices that were used to deliver the ad as well as information on how you may opt-out of these advertising programs. Additional information about your options regarding the use of your information for advertising purposes can be found below. Additional information about online behavioral advertising can be found here. Please note that Verizon does not have control over or access to information contained in the cookies that are set on your computer by ad servers, ad networks or third-party advertisers.

Additional information about "cookies" and "web beacons"

We also may provide third-party advertisers with geographic or demographic information that allows them to tailor their ads. This information does not identify you individually.

One such ad-delivery program helps advertisers reach our wireline Internet access customers within specified geographical areas. Using your postal address, Verizon determines whether you fit the geographic area an advertising campaign is trying to reach. We do not share your address as part of this process. You have a choice about participating in this advertising program.

Similarly, Verizon Wireless may help advertisers better reach Verizon Wireless Internet access customers using the postal address we have for you and certain consumer information (including your device type, language preferences and demographic and interest categories provided to us by other companies, such as gender, age-range, sports fan, frequent diner or pet owner). This information is used to predict whether you fit within an audience an advertiser is trying to reach. As part of this program, we do not share outside of Verizon, any information that identifies you personally. You have a choice about participating in this mobile advertising program.

Back to Summary

**How to Limit the Sharing and Use of Your Information**

You have choices about how Verizon shares and uses information.

**Customer Proprietary Network Information (CPNI):**

As described above, you may choose whether to allow Verizon to share your CPNI within the Verizon family of companies for certain marketing purposes. This choice will remain in effect unless you change it. Verizon Wireline consumer and small business customers may opt-out of this sharing by calling us using the state toll-free number provided in their notice and available here. Verizon Wireless mass-market customers may call 1-800-333-9956. National and major account customers of Verizon Wireless and corporate and government customers of Verizon Wireless or Verizon Business in the United States may decline to provide or withdraw CPNI consent by following the instructions in your service agreements or CPNI consent forms.

**Telemarketing:**

Federal "Do Not Call" laws allow you to place residential wireline and wireless phone numbers on the National Do Not Call Registry to prevent telemarketing calls to those numbers. If you would like to add your numbers to this list, you may do so by calling 1-888-382-1222, or by visiting www.donotcall.gov.

You should be aware that even if you add your number(s) to the federal or a state Do Not Call list, most telemarketing laws allow companies to contact their own customers. If at any time you would like to be removed from Verizon's residential telemarketing list, please let us know by contacting a Verizon customer service representative at 1-800-VERIZON. Verizon Wireless also maintains a Do Not Call list. If you would like to be removed from the Verizon Wireless telemarketing list, please let us know by contacting a Verizon Wireless customer service representative at 1-800-922-0204. Please allow 30 days for your telephone number to be removed from any sales programs that are currently underway.

**Marketing Email, Postal Mail and Door-to-Door Calls:**

Marketing emails you receive from Verizon include an unsubscribe instruction (usually found at the bottom of the email) that you may use to opt out of receiving future Verizon marketing-related emails. You may opt out of receiving marketing-related emails from Verizon by visiting our "Unsubscribe" site and providing the requested information. You may opt out of receiving marketing-related emails from Verizon Wireless by contacting a Verizon Wireless customer service representative at 1-800-922-0204.

You may opt out of receiving marketing-related postal mailings or prevent door-to-door marketing solicitations from Verizon by calling a customer service representative at 1-800-VERIZON. You may opt out of receiving marketing-related postal mailing or prevent text message marketing by Verizon Wireless by calling a Verizon Wireless customer service representative at 1-800-922-0204. Text message solicitations from Verizon Wireless also contain an "unsubscribe" feature that you can use to prevent future marketing text messages from us. Please note that Verizon may use bulk mail service for some marketing mailings. These services deliver offers to all homes in a neighborhood or zip code. This type of mailing will continue even if you opt-out of receiving marketing-related postal mailings from Verizon.

**Information Used for Online Advertising:**

You have choices about whether certain information collected on websites, including Verizon's, is used to customize advertising based on predictions generated from your visits over time and across different websites. When you see this icon ▷ in or around an

Case 2:12-cv-00301-JAM-CKD   Document 8   Filed 05/07/12   Page 43 of 60

advertisement you can click on the icon to see additional information on the companies and data practices that were used to deliver the ad and descriptions of how you may opt-out of these advertising programs. To learn more or to limit the collection of information by these parties, you may also visit the Aboutads.info website.

Please note that many opt-outs are cookie-based. If you buy a new computer, change web browsers or delete the cookies on your computer, you will need to opt-out again. Please also note that some wireless devices, portals and websites have limited ability to use and store cookies. As a result, advertising entities may have a limited ability to use cookies in the manner described above or to respect cookie-based opt out preferences. However, ads may still be tailored using other techniques such as publisher, device or browser-enabled targeting. You should check the privacy policies of the products, sites and services you use to learn more about any such techniques and your options. If you do not want information to be collected for marketing purposes from services such as the Verizon Wireless Mobile Internet services, you should not use those particular services.

You also can limit the collection of certain website information by deleting or disabling cookies. Most computers' Internet browsers enable you to erase cookies from your computer hard drive, block all cookies, or receive a warning before a cookie is stored.

See information about managing cookies

Please note that disabling cookies may prevent you from using specific features on our sites and other websites, such as ordering products or services and maintaining an online account. Cookies must be enabled for you to use your Verizon e-mail account.

**Relevant Advertising**
Verizon broadband Internet access customers may opt-out of the geographically-based advertising program described above by following the instructions here. Verizon Wireless Internet customers may opt-out of the relevant mobile advertising program by following the instructions here or by calling us at 1-866-211-0874. If you opt out online, you will need your account user ID and password. Also, please note that you will receive ads whether you participate in these programs or not, but under these programs, ads may be more relevant to you.

**Business and Marketing Reports**

Verizon Wireless customers may choose not to participate in Verizon Wireless' use of their information to create aggregated business and marketing reports that do not specifically identify any individual Verizon Wireless customers. You may opt-out by calling 1-866-211-0874 or by visiting verizonwireless.com/myprivacy. Please note that if you have a Family SharePlan® or multi-line account, you must indicate your opt-out choice for each line. If you add a line or change a telephone number, you will need to update your privacy choices.

Back to Summary

## Working Together to Help Keep Children Safe

Verizon recognizes that online service providers must be vigilant in protecting the safety and privacy of children online. We do not knowingly market to or solicit information from children under the age of 13, without obtaining verifiable parental consent.

Verizon strongly supports educating parents and young Internet users on safe viewing practices and we offer a variety of tools to help children and parents avoid encountering objectionable content or communications while using our services.

Verizon's Parental Control Center provides many free resources that offer guidance, connect parents with experts and help give parents the technical knowledge to help keep kids safer online.

Regrettably, there are those who use the Internet to view, store and distribute child pornography (or who engage in other types of illegal activity involving children). Child pornography is subject to severe criminal penalties and using the Verizon network to view, store or distribute it violates our service contracts. The Verizon network may not be used by customers in any manner for the storage, transmission or dissemination of images containing child pornography and we will report any instances of such activity of which we become aware to the appropriate law enforcement authorities.

If you have a complaint about child pornography, the soliciting of children for sexual activity, or any other illegal or inappropriate activity involving children on a Verizon service, report it to us by sending an email to abuse@verizon.net. Please include the words "child porn" in the subject line of your email. You can also make a report directly to the National Center for Missing and Exploited Children through its CyberTipline located at www.cybertipline.org.

Additional Internet safety resources and information are available at:

- http://www.netsmartz.org/
- http://www.wiredsafety.org/
- http://www.onguardonline.gov/
- http://www.commonsensemedia.org/
- http://www.webwisekids.org/
- http://www.stopbullying.gov/
- http://www.cyberbullying.us/
- http://www.connectsafely.org/

Back to Summary

## Information Security

Verizon has technical, administrative and physical safeguards in place to help protect against unauthorized access to, use or disclosure of customer information we collect or store, including Social Security Numbers. Employees are trained on the importance of protecting privacy and on the proper access to, use and disclosure of customer information. Under our practices and policies, access to sensitive personally identifiable information is authorized only for those who have a business need for such access, and sensitive records are retained only as long as reasonably necessary for business or legal purposes.

Although we work hard to protect personal information that we collect and store, no program is 100% secure and we cannot guarantee that our safeguards will prevent every unauthorized attempt to access, use or disclose personal information. Verizon maintains security and incident response plans to handle incidents involving unauthorized access to private information we collect or store.

If you become aware of a security issue, please contact Verizon's Security Control Center. We will work with you to address any

If you become aware of a security issue, please contact Verizon's Security Control Center. We will work with you to address any problems.

Verizon often publishes helpful information about a wide range of scams that you may encounter.

View current information about Internet and phone scams and tips on how to protect yourself

Back to Summary

## Contact Information

If you have questions, concerns or suggestions related to our Privacy Policy or our privacy practices you may contact us at:

Verizon Privacy Office
1320 North Courthouse Road
9th Floor
Arlington, VA 22201
Fax: 703-351-3669
Email: privacyoffice@verizon.com

## Accessing and Updating Your Information

We strive to keep our customer records as accurate as possible. Please let us know if you see any inaccuracy in your information or if your information changes. You may request such changes by calling a customer service representative at 1-800-VERIZON or by accessing your account online and updating your account information. Similarly, updates can be made to your Verizon Wireless account by calling a Verizon Wireless customer service representative at 1-800-922-0204 or online. Verizon Business customers may update their information by contacting their account manager.

## Links to non-Verizon Websites

Verizon websites may contain links to non-Verizon sites. We are not responsible for the content on these sites or the privacy policies and practices employed by these sites. We recommend that you review the policies and practices of the sites you visit.

## Information Sharing: Blogs and Social Networks

Some Verizon websites allow you to participate in web log ("blog") discussions and other forms of social networking. Please be aware that these blogs and social networks are accessible to other users. We urge you to not submit any personally identifiable information on these sites because any information posted on a blog can be read, collected, shared, or otherwise used by anyone who accesses the site. Verizon is not responsible for the information you choose to submit in these forums.

## Changes to This Policy

We reserve the right to make changes to this Privacy Policy, so please check back periodically for changes. You will be able to see that changes have been made by checking to see if the effective date posted at the end of the policy.

If Verizon elects to use or disclose information that identifies you as an individual in a manner that is materially different from that stated in our policy at the time we collected that information from you, we will give you a choice regarding such use or disclosure by appropriate means, which may include use of an opt-out mechanism.

Updated September 2011

**© 2009, 2010, 2012 Verizon. All Rights Reserved.**

© 2012 Verizon

# Attachment

# D

DOES 1-265, Defendants.                CASE No. S-12-0301 JAM CKD

MOTION TO QUASH  SUBPOENA

### _CALIFORNIA CODE 22575_

Copy provided for the convenience of the Court.

**BUSINESS AND PROFESSIONS CODE**
**SECTION 22575-22579**

22575.   (a) An operator of a commercial Web site or online service
that collects personally identifiable information through the
Internet about individual consumers residing in California who use or
visit its commercial Web site or online service **shall conspicuously
post its privacy policy on its Web site**, or in the case of an
operator of an online service, make that policy available in
accordance with paragraph (5) of subdivision (b) of Section 22577. An
operator shall be in violation of this subdivision only if the
operator fails to post its policy within 30 days after being notified
of noncompliance.
   (b) The privacy policy required by subdivision (a) shall do all of
the following:
   **(1) Identify the categories of personally identifiable information
that the operator collects through the Web site or online service
about individual consumers who use or visit its commercial Web site
or online service and the categories of third-party persons or
entities with whom the operator may share that personally
identifiable information.**
   (2) If the operator maintains a process for an individual consumer
who uses or visits its commercial Web site or online service to
review and request changes to any of his or her personally
identifiable information that is collected through the Web site or
online service, provide a description of that process.
   (3) Describe the process by which the operator notifies consumers
who use or visit its commercial Web site or online service of
material changes to the operator's privacy policy for that Web site
or online service.
   (4) Identify its effective date.


22577.   For the purposes of this chapter, the following definitions
apply:
   (a) The term "personally identifiable information" means
individually identifiable information about an individual consumer
collected online by the operator from that individual and maintained
by the operator in an accessible form, including any of the
following:
   (1) A first and last name.
   (2) A home or other physical address, including street name and
name of a city or town.
   (3) An e-mail address.
   (4) A telephone number.
   (5) A social security number.
   (6) Any other identifier that permits the physical or online
contacting of a specific individual.
   (7) Information concerning a user that the Web site or online
service collects online from the user and maintains in personally
identifiable form in combination with an identifier described in this
subdivision.
   (b) The term "conspicuously post" with respect to a privacy policy
shall include posting the privacy policy through any of the
following:
   (1) A Web page on which the actual privacy policy is posted if the
Web page is the homepage or first significant page after entering
the Web site.
   (2) An icon that hyperlinks to a Web page on which the actual
privacy policy is posted, if the icon is located on the homepage or
the first significant page after entering the Web site, and if the
icon contains the word "privacy." The icon shall also use a color
that contrasts with the background color of the Web page or is
otherwise distinguishable.
   (3) A text link that hyperlinks to a Web page on which the actual
privacy policy is posted, if the text link is located on the homepage
or first significant page after entering the Web site, and if the
text link does one of the following:
   (A) Includes the word "privacy."
   (B) Is written in capital letters equal to or greater in size than
the surrounding text.
   (C) Is written in larger type than the surrounding text, or in
contrasting type, font, or color to the surrounding text of the same
size, or set off from the surrounding text of the same size by

symbols or other marks that call attention to the language.
    (4) Any other functional hyperlink that is so displayed that a
reasonable person would notice it.
    (5) In the case of an online service, any other reasonably
accessible means of making the privacy policy available for consumers
of the online service.
    (c) The term "operator" means any person or entity that owns a Web
site located on the Internet or an online service that collects and
maintains personally identifiable information from a consumer
residing in California who uses or visits the Web site or online
service if the Web site or online service is operated for commercial
purposes. It does not include any third party that operates, hosts,
or manages, but does not own, a Web site or online service on the
owner's behalf or by processing information on behalf of the owner.
    (d) The term "consumer" means any individual who seeks or
acquires, by purchase or lease, any goods, services, money, or credit
for personal, family, or household purposes.


22578.   It is the intent of the Legislature that this chapter is a
matter of statewide concern. This chapter supersedes and preempts all
rules, regulations, codes, ordinances, and other laws adopted by a
city, county, city and county, municipality, or local agency
regarding the posting of a privacy policy on an Internet Web site.


22579.   This chapter shall become operative on July 1, 2004.

# Attachment

# E

DOES 1-265, Defendants.

CASE No. S-12-0301 JAM CKD

MOTION TO QUASH  SUBPOENA

*CALIFORNIA CODE 22948 – Anti-Phishing Act of 2005*

Copy provided for the convenience of the Court.

**BUSINESS AND PROFESSIONS CODE**
**SECTION 22948-22948.3**


**22948.   This chapter shall be known and may be cited as the**
**Anti-Phishing Act of 2005.**


22948.1.   For the purposes of this chapter, the following terms have
the following meanings:
     (a) "Electronic mail message" means a message sent to a unique
destination, commonly expressed as a string of characters, consisting
of a unique user name or mailbox (commonly referred to as the "local
part") and a reference to an Internet domain (commonly referred to
as the "domain part"), whether or not displayed, to which an
electronic message can be sent or delivered.
     (b) "Identifying information" means, with respect to an
individual, any of the following:
     (1) Social security number.
     (2) Driver's license number.
     (3) Bank account number.
     (4) Credit card or debit card number.
     (5) Personal identification number (PIN).
     (6) Automated or electronic signature.
     (7) Unique biometric data.
     (8) Account password.
     (9) Any other piece of information that can be used to access an
individual's financial accounts or to obtain goods or services.
     (c) "Internet" shall have the meaning as defined in paragraph (6)
of subdivision (f) of Section 17538.
     (d) "Web page" means a location that has a single uniform resource
locator or other single location with respect to the Internet.


**22948.2.   It shall be unlawful for any person, by means of a Web**
**page, electronic mail message, or otherwise through use of the**
**Internet, to solicit, request, or take any action to induce another**
**person to provide identifying information by representing itself to**
**be a business without the authority or approval of the business.**


22948.3.   (a) The following persons may bring an action against a
person who violates or is in violation of Section 22948.2:
     (1) A person who (A) is engaged in the business of providing
Internet access service to the public, owns a Web page, or owns a
trademark, and (B) is adversely affected by a violation of Section
22948.2.
     An action brought under this paragraph may seek to recover the
greater of actual damages or five hundred thousand dollars
($500,000).
     (2) An individual who is adversely affected by a violation of
Section 22948.2 may bring an action, but only against a person who
has directly violated Section 22948.2.
     An action brought under this paragraph may seek to enjoin further
violations of Section 22948.2 and to recover the greater of three
times the amount of actual damages or five thousand dollars ($5,000)
per violation.
     (b) The Attorney General or a district attorney may bring an
action against a person who violates or is in violation of Section
22948.2 to enjoin further violations of Section 22948.2 and to
recover a civil penalty of up to two thousand five hundred dollars
($2,500) per violation.
     (c) In an action pursuant to this section, a court may, in
addition, do either or both of the following:

(1) Increase the recoverable damages to an amount up to three times the damages otherwise recoverable under subdivision (a) in cases in which the defendant has engaged in a pattern and practice of violating Section 22948.2.

(2) Award costs of suit and reasonable attorney's fees to a prevailing plaintiff.

(d) The remedies provided in this section do not preclude the seeking of remedies, including criminal remedies, under any other applicable provision of law.

(e) For purposes of paragraph (1) of subdivision (a), multiple violations of Section 22948.2 resulting from any single action or conduct shall constitute one violation.

# Attachment

# F

DOES 1-265, Defendants.                    CASE No. S-12-0301 JAM CKD

MOTION TO QUASH  SUBPOENA

## *WIRED article on Scott Hervey's business model*

Copy provided for the convenience of the Court.



# How Mass BitTorrent Lawsuits Turn Low-Budget Movies Into Big Bucks

By David Kravets March 31, 2011 | 2:36 pm

On March 7, Camelot Distribution Group, an obscure film company in Los Angeles, unveiled its latest and potentially most profitable release: a federal lawsuit against BitTorrent users who allegedly downloaded the company's 2010 B-movie revenge flick *Nude Nuns With Big Guns* between January and March of this year. The single lawsuit targets 5,865 downloaders, making it theoretically worth as much as $879,750,000 — more money than the U.S. box-office gross for *Avatar*.

At the moment, the targets of the litigation are unknown, even to Camelot. The mass lawsuit lists the internet IP addresses of the downloaders and asks a federal judge to order ISPs around the country to dig into their records for each customer's name.

It's the first step in a process that could lead to each defendant getting a personalized letter in the mail from Camelot's attorneys suggesting they settle the case, lest they wind up named in a public lawsuit as having downloaded *Nude Nuns With Big Guns.*

A hearing on that request is set for April 13. In all probability none of the alleged downloaders know it's happening.

Welcome to the future of Hollywood, or at least the less glittery outskirts of Tinsel Town that produce art films, exploitation flicks and porn. Over the past year, small-budget film producers have nearly perfected a slick, courtroom-based business strategy that's targeted more than 130,000 suspected movie downloaders.

The types of films include the Oscar-winning *Hurt Locker*, the less-critically acclaimed *Nude Nuns*, and dozens of adult movies.

In contrast to the the RIAA's much-criticized and now-abandoned war against music pirates — which targeted 20,000 downloaders in six years — the movie lawsuits appear to have been designed from the start as for-profit endeavor, not a as a deterrent to piracy.

They differ from the music litigation campaign in another significant way, as well. Civil defendants are normally sued in the courthouse nearest to where they committed the alleged wrongdoing — in this instance on computers in their homes or work. It's a bread-and-butter legal precept meant to prevent people who live in California from having to answer to lawsuits in Texas, for example.

Following that standard — more or less — the RIAA generally targeted dozens or so defendants in each suit, not thousands, and filed each case in the jurisdiction of the users' ISP. The RIAA lost millions of dollars with this strategy, which required them to pay individual $350 filing fees for each case, and sometimes engage local counsel.

The movie studios, in contrast, often are suing thousands of people at once, in a total of just about often filed in the plaintiff's lawyer's backyard and far from the defendants' homes.

This strategy was pioneered last year by the U.S. Copyright Group, a coalition of indy film producers formed explicitly to make money by suing downloaders. It's now being mimicked by individual production companies.

The *Nuns* lawsuit, "Camelot Distribution Group Inc, v. Does 1 through 5865", is the most recent. A February 2 lawsuit filed in Illinois, "Openmind Solutions, Inc. v. Does 1-2925," is targeting alleged downloaders over adult titles like *Throated*, *1000 Facials Britney Beth* and *Stuffed Petite.*

Rights groups and defense lawyers are rankled by the large-scale, semi-automated character of the litigation.

"This is a mass copyright litigation machine," says Lory Lybeck, a Seattle attorney representing dozens of the defendants. "Most people don't want to have a public lawsuit against them for *Teen Anal Nightmare 2*, so they settle."

Using an outside contractor, like the U.K. firm GuardaLey, the companies start by trolling BitTorrent sites for the films in question, and dipping into the active torrents, capturing the IP addresses of the peers that are downloading and uploading pieces of the files.

The companies identify the service provider for each IP address from a public database, then generate a spreadsheet, with the IP, the name of the service provider, the date and time of the download, and sometimes the size of the file and the BitTorrent client used.

The spreadsheet is converted to a PDF and attached to a discovery demand filed with

the court, asking a judge to grant subpoenas to all the ISPs. Once the film company
has the name and address of the customers, they send out settlement letters.

"If forced to proceed against you in a lawsuit, we will most certainly have a computer
forensic expert inspect your computer in an effort to locate the subject movie file, or to
determine if you have deleted any media files," reads one of the letters sent in
the Copyright Group's *Hurt Locker* case.

"If in the course of litigation the forensic computer evidence suggests that you did
delete media files after being on notice of our client's claims, our client will add a
spoliation of evidence claim against you."

The *Hurt Locker* letter threatens the alleged file sharer with a $150,000 fine, the
maximum allowed under the Copyright Act, and demands a $2,900 settlement if paid
by a certain date, $3,900 afterward. The recipient is referred to the group's online
payment site" for convenience. (Thomas Dunlap, the Copyright Group's lead attorney,
did not respond for comment.)

It's an efficient model for winning settlements: the movie downloaders face the
prospect of defending against a federal lawsuit, possibly thousands of miles away, and
having a third party rifle through their computer. A quick settlement is even more
appealing in cases involving pornography, where a defendant who chooses to fight
likely will see their name on a public court docket.

That's the predicament a 38-year-old Houston, Texas, man finds himself in. A
defendant in "West Coast Productions v. Does 1 – 5,829," filed in Washington, D.C.
in January, the man was notified by Comcast this month that a subpoena is seeking
his information in connection with *Teen Anal Nightmare 2*. He has a month to
challenge the subpoena.

The man, who spoke to WIRED on condition of anonymity, says he wants to fight the
allegations. But to do so, he likely would have to litigate halfway across the country,
and his name might be exposed by the sheer act of challenging the subpoena.

"I didn't download this," he says. "I'm gonna fight this."

Nancy Waddell, an Iowa woman targeted in the Openmind Solutions porn case, says
she was terrified when she received her settlement letter. She insists she never
downloaded anything, but concedes a relative might have downloaded movies from
her internet connection while living in her house.

"It won't happen again, because I don't know how to do much other than e-mail and

Facebook on a computer," she wrote the court.

"I'm freaked out," Waddell, a 54-year-old single factory worker, said in a recent telephone interview. "This has got me scared to death."

The Electronic Frontier Foundation says the studios' litigation engine would grind to a halt if the plaintiffs were forced to break up their lawsuits into regions. The group argues that there's no legitimate reason a single case should be allowed to target 5,000 or more defendants.

Even at the early stage of the proceedings, when a film company has little information but an IP address, it's a simple matter to determine the proper venue using geolocation tools, or by suing at the location of the ISP.

"Anybody with access to a computer can take an IP address and find out where it is," says Corynne McSherry, the EFF's lead copyright litigator. "Why are the courts allowing this when the judges don't have jurisdiction? They're allowing a commercial venture of trolls."

Last week, the EFF persuaded U.S. District Judge Stephen Williams in East St. Louis to put a hold on the subpoenas targeting 2,925 alleged porn downloaders pending an April 11 hearing. John Steele, the Chicago lawyer representing Openmind Solutions, said in a court filing that the EFF "raises red herring arguments in the pursuit of selfish aims at the expense of the efficient administration of justice. The court should ignore the EFF and its hollow cries of unfairness." (Steele declined interview requests.)

Other judges are approving the mass filings. Last week, U.S. District Judge Beryl Howell in Washington, D.C. — who is a former RIAA lobbyist — approved subpoenas in a 2010 lawsuit filed by the U.S. Copyright Group, overruling protests by Time Warner Cable that responding to subpoenas for 1,028 of its subscribers would be too big of a task for the broadband provider.

"Given the administrative burden of simply obtaining sufficient identifying information to properly name and serve alleged infringers, it is highly unlikely that the plaintiffs could protect their copyrights in a cost-effective manner," Judge Howell ruled.

She granted the Copyright Group's discovery request, which targets 5,500 alleged downloaders of *Deceitful Storm*, *Fast Track No Limits* and *A Numbers Game*, among other films.

The low-budget studios' tactics are markedly different from those employed by the Motion Picture Association of America, which represents larger studios. The MPAA

generally has focused its efforts on lobbying, and litigating against the file sharing websites themselves. It has effectively shuttered every U.S.-based BitTorrent site. Decisions against two of the biggest names in movie piracy — The Pirate Bay of Sweden and IsoHunt of Canada — are pending.

But however controversial, the mass-litigation tactics appear to be working; defendants are settling the cases out of court, according to interviews with defense attorneys. Terms are confidential.

"Most of the people I represent settle immediately because they want this over," says Illinois attorney Charles Mudd. "This is an abuse of the court process."

Scott Hervey, the Los Angeles attorney behind the *Nude Guns with Big Guns* lawsuit, takes issue with that. "My goal is to lessen the severe economic impact that illegal downloading is having on my clients," he said in a telephone interview. He also thinks it's only fair that a California judge demand internet companies to cough up the account holders of the IP addresses, even if they don't live near Los Angeles.

The infringement is so widespread, he said, that this is the most efficient method of protecting Camelot's intellectual property.

"The only information we have on them right now is a series of numbers and dots," he said. "Once we find out who these people are, we will give them an opportunity to resolve this issue."

—

*Disclaimer: Results of Wired.com's IP Detective tool (above) are not conclusive. If a match is found, **this does not mean your computer was used to download the file in question**, nor that you are a target of the lawsuit. IP addresses can change from time to time. If you didn't personally use BitTorrent to download the named film on the day and time listed, it's likely your computer has simply inherited the IP address of someone who did.*

# Attachment

# G

DOES 1-265, Defendants.                    CASE No. S-12-0301 JAM CKD

MOTION TO QUASH SUBPOENA

***Scott Hervey Legal Bio***

Copy provided for the convenience of the Court.

Case 2:12-cv-00301-JAM-CKD Document 8 Filed 05/07/12 Page 58 of 60

# weintraub genshlea chediak
# tobin & tobin

## LAW CORPORATION



## Education

J.D., *with distinction,* University of the Pacific, McGeorge School of Law, 1995

B.A., California State University, Northridge, 1992

## Bar Admissions

California

## Affiliations

# Scott M. Hervey

Contact information:
Shareholder
scott.hervey@weintraub.com
T: 310.425.2352 : 916.558.6065
F: 916.446.1611
download v-card

## Practice Areas

- Corporate
- Entertainment/New Media
- Intellectual Property
- Licensing and Distribution
- Mergers & Acquisitions
- Private Equity and Venture Capital

Scott Hervey is a corporate and intellectual property attorney who works with companies in a variety of different industries. He represents technology companies, entertainment/new media companies, wineries, restaurants and all varieties of brand driven enterprises in licensing and acquisitions, financings, and other general business transactions. Scott also assists his clients in protecting their valuable brands through trademark infringement litigation, domain name infringement arbitration, and proceedings before the United States Patent and Trademark Office and Trademark Trial and Appeals Board.

Scott's entertainment practice is primarily in the area of television, music and independent films. Scott regularly represents television production companies and has served as counsel on television programming for NBC, E!, VH1, CMT, TruTV, Discovery, A&E, and FUSE.

Scott also represents new media and technology companies in a wide variety of matters including venture financing, acquisitions and general business issues. Scott previously served as the acting business affairs director for the publicly traded digital content company, Digital Music Group, Inc. (now The Orchard).

Scott has extensive knowledge and experience in trademark and copyright law. He has guided clients in a variety of industries (from gaming machine manufacturer Aristocrat Technologies, to the Palms Casino and Resort in Las Vegas, to retail operators such as The Berry Factory, publicly traded medical device company ThermoGenesis, to sports and entertainment figure Hulk Hogan) in the domestic and international trademark registration process for thousands of trademarks. Scott also assists his clients in protecting their valuable brands through trademark infringement litigation, domain name infringement arbitration, and proceedings before the United States Patent and Trademark Office and Trademark Trial and Appeals Board.

From financing to operational matters, Scott has worked with a number of wineries,

State Bar of California, Business Law and Intellectual Property Law Sections and Trademark Subcommittee

restaurants and other businesses in the club and concert venue industries. Among others, the Palms Casino and Resort in Las Vegas has added Scott to its team to provide advice and assistance in the operation of its restaurants, bars, clubs, lounges and concert venue.



## Representative Transactions

Intellectual Property

- Representation of companies in all industries in domestic and foreign trademark registration, maintenance and rights enforcement actions;
- Representation of new media company in complex copyright infringement action;
- Representation of new media technology company in a series of multi-million dollar content acquisition transactions;
- Representation of software development company in multi-million dollar sale of company and international software development and technology transfer agreement with German technology university;
- Representation of Hulk Hogan in various brand licensing transactions.

Music Industry

- Represented of artists in negotiation recording agreements with major label (e.g., Universal) and large independent label (e.g., Savoy, Concord, Compass Records); representation of independent record labels in distribution, licensing and artist agreements;
- Counsel for Palms Casino and Resort Hotel concert venue in transactions with national concert promoter, major concert series sponsors, and top tier talent.

Television Industry

- Representation of Los Angeles based television production companies in negotiating agreements for the production of television programming for E!, VH1, CMT, TruTV, Discovery, A&E, and NBC;
- Served as production counsel for various television and pay-per-view programs;
- Representation of on-air talent in the negotiation of talent agreements for cable and network television programs.

Independent Film Industry

- Served as acting business counsel director for independent film production company Redwood Palms Pictures in structuring film slate financing transactions, theatrical and home video distribution agreements for numerous pictures including *Battle in Seattle, Numb, When a Man Falls in The Forest,* and *While She Was Out;*
- Structured a $6 million multi-film syndication financing transaction for 6 direct to video motion pictures;
- Served as production counsel for numerous independent film projects.

New Media Industry

- Served as acting director of business affairs for publicly traded digital content aggregator and represented company in the acquisition of over $40 million dollars of music and video content; negotiated over 50 distribution agreements with mobile and Internet retailers, including iTunes, Napster, YouTube, Revver, Lycos, Yahoo music, Zingy, and Cingular;
- Represented world renowned Las Vegas hotel in digital music sponsorship agreement with iTunes;
- Representation of one of the most watched YouTube content producers in various content production and sponsorship transactions.

Wineries / Restaurant / Club / Concert Venue Industries

- The formation and structuring of numerous corporate entities for wineries, restaurant and night club owners, and assistance in financing transactions;
- Assisting wineries, restaurant, club and concert venue clients in developing and protecting their brands;

- Negotiating and closing sponsorship and vendor agreements with major beer, liquor and energy drink companies;
- Negotiating and closing cook book publishing deal with HarperCollins for Los Angeles area chef;
- Assisting the Palms Casino in negotiating and closing agreements with celebrity chef Kerry Simon to open *Simon Restaurant/Lounge*;
- Representation in all matters; counsel for Las Vegas based concert venue in transactions with national concert promoter, major concert series sponsors, and top tier talent;
- Representation of franchisor in formation of restaurant franchise system; representation of numerous restaurant franchisees in major franchise systems such as Togos.

Scott is the editor-in-chief and frequent contributor to The IP Law Blog (www.theiplawblog.com) and has published a law review article entitled *The Future of Online Music: Labels and Artists*. Scott is a frequent lecturer for the California State Bar and the American Corporate Counsel Association.

## Related News

- IT'S OFFICIAL - WEINTRAUB MERGES WITH SAN FRANCISCO FIRM TOBIN & TOBIN
- ALDEN J. PARKER JOINS WEINTRAUB GENSHLEA CHEDIAK
- Weintraub Genshlea Chediak Announces New Los Angeles Office

View all Related News»

## Related Events

- Upcoming Seminars for Wineries
- Scott Hervey to Speak at UC Davis Entrepreneurship Academy

## Related Publications

- Federal Circuit Puts Generic 1800Mattress Trademark to Bed
- 7th Circuit Case Should Serve As A Reminder To Business Attorneys
- Hallmark Cards Raises Unique Defense to Paris Hilton's Right of Publicity Claim - That's Hot

View all Related Publications»

© 2012 Weintraub Genshlea Chediak Tobin & Tobin
Since 1852